WILLIAM J. LAW AND HELEN M. LAW, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 17315-82, 10054-83.    Filed May 22, 1986.

*Melvin E. Pearl, Rex À. Guest,* and *Glenn A. Nadell,* for the petitioners.

*David D. Baier* and *Thomas J: Kane,* for the respondent.

SIMPSON, *Judge*: The Commissioner determined deficiencies in the petitioners' Federal income taxes of $7,962 for 1978 and $17,146 for 1979. The issues for decision are: (1) Whether William J. Law, as a limited partner in a partnership purportedly engaged in the purchase and distribution of a motion picture, is entitled to deductions for a distributive share of losses reported by the partnership and, if so,

in what amounts; and (2) whether the petitioner is entitled to an investment tax credit.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, William J. and Helen M. Law, husband and wife, maintained their legal residence in Great Falls, Montana, at the time they filed their petitions in these cases. They filed their joint Federal income tax returns for 1978 and 1979 with the Internal Revenue Service Center, Ogden, Utah. Mr. Law will sometimes be referred to as the petitioner.

In 1977, Navarone[1] acquired all motion picture and allied rights in the screenplay and underlying literary material entitled "Force 10 From Navarone" (the motion picture or film). The screenplay was written by Robin Chapman and George MacDonald Fraser and was based on a screen story adapted by Carl Foreman from the novel "Force 10 From Navarone" by Alistair MacLean. "Force 10 From Navarone" chronicles the further adventures of several characters that appeared in the highly successful motion picture "Guns of Navarone," which was also based on an Alistair MacLean novel.

In August 1977, Navarone entered into a distribution agreement (the AIP-Navarone distribution agreement) with American International Pictures, Inc. (AIP).[2] AIP, a Delaware corporation headquartered in Beverly Hills, California, was the sole shareholder of American International Productions, Inc. (American International), which, in turn, was the sole shareholder of Wetherly Productions, Inc. (Wetherly). AIP and its subsidiaries maintained separate bank accounts, but they filed consolidated tax returns under the name of

[1] Some of the agreements referred to herein were executed by Navarone Productions, Ltd., a corporation organized under the laws of the United Kingdom, while other of the agreements were entered into by Navarone Productions, N.V., a Curacao corporation. The record does not establish the exact relationship between these companies, but it does establish that, in 1977, they jointly acquired the motion picture rights to "Force Ten From Navarone" from a corporation called High Noon Productions, Inc. For convenience, we shall refer to Navarone Productions, Ltd., and Navarone Productions, N.V., as "Navarone."

[2] In 1980, after a merger with another distribution company, the name of American International Pictures, Inc., was changed to Filmways Pictures, Inc. The company is now called Orion Pictures Distribution Corp. and is a subsidiary of Orion Pictures Corp.

AIP. Wetherly was headquartered in the offices of AIP in Beverly Hills.

Under the AIP-Navarone distribution agreement, Navarone agreed to produce the motion picture and granted AIP the exclusive, perpetual, and irrevocable:

right, license and privilege under copyright to rent, lease, license, exhibit, distribute, reissue, deal in and with respect to the Picture and prints or any part thereof, and trailers thereof, and to license others to do so, in standard and substandard gauges, theatrically and non-theatrically, and by means of television in all forma [sic] (except for the grant of rights for three (3) network runs as set forth in the ABC Agreement) whether now known or hereafter to be known, and by means of wire, cartridges, cassettes and any and all other means of projection, transmission, broadcasting and exhibition, as hereinafter more fully set forth, throughout the [licensed territory] * * *

AIP was expressly granted (among other rights) all marketing, advertising and publication rights, all music rights (including the right to make and sell phonograph records or tapes of all or a part of the motion picture soundtrack), all publishing rights, radio and television series and specials rights, and "all other ancillary and subsidiary rights in connection with the Picture, including, without limiting the generality of the foregoing, so-called merchandising rights and commercial tie-ups." AIP also had the right to cause the picture to be copyrighted in the distribution territory in the name of Navarone or AIP, as AIP determined. The "licensed territory" was defined as the United States and Canada and their respective territories, possessions, agencies, commonwealths, and mandates, including Puerto Rico, American Virgin Islands, Panama Canal Zone, Guam, and American Samoa.[3]

In return for the rights granted under the AIP-Navarone distribution agreement, AIP agreed to advance $2.1 million toward the production costs of the motion picture and to pay Navarone 100 percent of the "net producer's share of gross receipts," if any. "Net producer's share of gross receipts" was defined essentially as AIP's "gross receipts" (i.e., AIP's actual receipts from theatrical and television exhibitors and from the commercial exploitation of all

---

[3] Because all of the transactions related herein involved such territory, we shall refer to such territory as "the United States and Canada" throughout our findings of fact and opinion.

ancillary rights, net of collection costs) less AIP's distribution fee (32½ percent, but rising to 45 percent once AIP entirely recouped its distribution fee and expenses and its production advance with interest thereon) and distribution expenses, and less AIP's production advance of $2.1 million together with interest thereon.

The AIP-Navarone distribution agreement further provided that Navarone was to physically deliver to AIP, at the place and to the persons designated by AIP, a variety of motion picture materials, including a composite positive print, the original picture negative, and the original sound recording. AIP was entitled to exclusive possession of such materials, exclusive access to the negative, and the exclusive right to obtain prints of the motion picture. AIP and its licensees could cut, edit, or otherwise change the motion picture or its title as AIP deemed necessary. The AIP-Navarone distribution agreement was freely assignable by AIP.

Navarone commenced production of the motion picture in late 1977 and completed it sometime in 1978. The motion picture was filmed in the United Kingdom, Yugoslavia, Malta, and the Channel Islands. Produced by Oliver Unger, the motion picture was directed by Guy Hamilton, who had previously directed the James Bond films "Goldfinger" and "Live and Let Die." The motion picture had a well-known cast, including Robert Shaw, Harrison Ford, Barbara Bach, Edward Fox, Carl Weathers, Richard Kiel, and Franco Nero.

Navarone budgeted the production costs of the motion picture at $8,312,224, but the final production costs actually exceeded $10 million. Pursuant to the AIP-Navarone distribution agreement, AIP advanced a total of $2,104,942.93 to Navarone. AIP subsequently spent an additional $97,109.15 to produce a U.S. version of the film. Several other entities also contributed money toward the production costs: Columbia Pictures advanced $2,900,000 (and agreed to pay $1,100,000 more after delivery of the film) in return for the exclusive and perpetual distribution rights in all territories outside the United States and Canada; a German investment group contributed $1 million in return for a participation in the producer's share of the motion picture's receipts; a Yugoslavian production company lent or provided services

equal to $2 million; and American Broadcasting Co. (ABC) paid $1,800,000 for the right to broadcast the motion picture 3 times on network television. Because the production costs went over budget, a completion guarantee company had to advance substantial amounts so that the picture could be completed.

The motion picture was delivered to AIP at Movielab in Los Angeles in late September or early October of 1978. In early October 1978, Navarone Productions, Ltd., and Navarone Productions, N.V.,[4] executed copyright assignments in favor of AIP that provided that they did:

> hereby sell, assign, transfer and set over unto American International Pictures, Inc., its successors and assigns the copyright in and to the motion picture entitled "Force Ten From Navarone", and all of * * * [its] right, title and interest, vested and contingent, therein and thereto, for the [United States and Canada] * * * in perpetuity.

The copyright assignments were recorded in the Copyright Office of the United States on October 25, 1978.

In 1978, AIP had an ongoing company policy to reduce the financial pressure on its working capital for motion picture production costs and advertising by bringing in third-party participants who would contribute cash in return for a percentage participation in a motion picture's receipts. In 1975 or 1976, representatives of AIP were introduced to Melvin Pearl, and they discussed the arrangement by Mr. Pearl of partial financing for some of AIP's motion pictures. By 1978, AIP had sold[5] four pictures to limited partnerships represented by Mr. Pearl.

Mr. Pearl, an attorney, was a partner in the Chicago law firm of Katten, Muchin, Gitles, Zavis, Pearl & Galler[6] (Katten, Muchin). Since its formation in 1974, Katten, Muchin has had a close relationship with the Balcor Co. (Balcor).[7]

Balcor was a partnership primarily engaged in the syndication of real estate investments. Its partners were an

---

[4] See note 1 supra.

[5] Use of such terms as "acquisition," "purchase," "sale," "license," "own," "interest," "principal," and "price" should not be construed as carrying any conclusion as to the legal effect of the documents or transactions.

[6] The law firm is now named Katten, Muchin, Zavis, Pearl & Galler.

[7] The Balcor Co. has since been acquired by American Express and is now known as Balcor American Express.

insurance company and RGF-Balcor Associates (RGF), another partnership. RGF was composed of about nine partners, including Jerry M. Reinsdorf, the chairman of Balcor and an attorney "of counsel" to Katten, Muchin.

Mr. Pearl first became involved in the motion picture business in 1971 or 1972 when he negotiated the production of a movie for a legal client and arranged to finance the production through a limited partnership. Subsequently, he, Mr. Reinsdorf, and Mr. Reinsdorf's partners in RGF decided to engage in the syndication of motion picture investments. RGF and Mr. Pearl organized motion picture production service partnerships prior to 1976 (and the enactment of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520). In 1977, RGF and Mr. Pearl, as nominee for Katten, Muchin, formed an Illinois general partnership named TBC Films to engage in the negotiation, organization, and promotion of motion picture "negative pickup" limited partnerships of the kind involved in the present case. By the summer of 1978, TBC Films had syndicated about 8 to 10 such partnerships.

Neither TBC Films nor the limited partnerships had any employees. Mr. Pearl and other members of Katten, Muchin, the partners in RGF, and the employees of Balcor conducted the partnerships' affairs. When TBC Films was first formed, both Mr. Pearl and Mr. Reinsdorf participated in negotiations for the acquisition of motion pictures. Once they developed the basic format, or structure, of such acquisitions, Mr. Pearl undertook sole responsibility for the location of suitable motion pictures and the negotiation of the terms of their purchase. The partners of RGF and the employees of Balcor were responsible for the formation, syndication, and administration of limited partnerships to acquire the motion pictures. The structure of the motion picture investment involved in the present case was typical of those promoted by TBC Films.

In selecting motion pictures for TBC Films' limited partnerships, Mr. Pearl chose only films which had important producers and well-known casts and which were assured of distribution by prominent distribution companies. In negotiating the terms of a purchase, he always insisted that the limited partnership receive an income

interest based on the gross receipts reported by the distributor, rather than on the net receipts of the distributor, because he felt a gross position was more likely to generate income; a net position would have allowed the distributor to recoup all distribution expenses and fees before sharing any receipts with the partnership.[8] Several of the motion picture partnerships formed by Mr. Pearl have returned a profit to their investors.

Sometime prior to June 27, 1978, Mr. Pearl met with Jerome Schwartz, vice president and general counsel of AIP and president of Wetherly, and David Melamed, executive vice president of finance of AIP, at AIP's office to discuss the sale of "Force 10 From Navarone." Negotiations ensued, and by mid-July 1978, the parties involved in the transactions agreed on all major terms detailed below.

Representatives of the contracting parties executed the following documents (among others)[9]: (1) An assignment and appointment of distributor; (2) a Wetherly-Lionel acquisition agreement; (3) a Lionel note; and (4) an AIP-Lionel distribution agreement.

By means of the first document, AIP assigned to Wetherly, its wholly owned subsidiary, "for good and valuable consideration," all of AIP's:

right, title and interest in and to the motion picture entitled "FORCE 10 FROM NAVARONE" ("Picture"), including, without limitation, all right, title and interest of AMERICAN INTERNATIONAL PICTURES, INC. under * * * [the AIP-Navarone distribution agreement]. This assignment is made on the condition that Assignee will appoint AMERICAN INTERNATIONAL PICTURES, INC. as the sole distributor of the Picture.

On the same document, Wetherly appointed AIP distributor, as follows:

The undersigned, WETHERLY PRODUCTIONS, INC., pursuant to the above condition, does hereby appoint AMERICAN INTERNATIONAL PICTURES, INC. as the distributor of the Picture "FORCE 10 FROM NAVARONE".

---

[8] Whether a gross position was in fact more favorable than a net position depended upon a number of factors, including: the percentage of gross receipts to which the partnership was entitled and the threshold level of gross receipts to be reached before the partnership was entitled to begin receiving its share.

[9] Although the documents are dated June 27, 1978, they were not executed until sometime after Sept. 18, 1978, but before Oct. 19, 1978.

AIP signed a statement accepting such appointment.

The Wetherly-Lionel acquisition agreement was entered into by Wetherly and Lionel American Corp. (Lionel), an Illinois corporation, and, by its terms, sold and conveyed to Lionel all of Wetherly's right, title, and interest in the motion picture "Force 10 From Navarone" in the United States and Canada:

and the literary, dramatic and musical material upon which the picture is based or which is contained therein (all such material being hereinafter referred to as the "material"), including an undivided interest in the original camera negative and all physical materials of and in respect thereto and any and all copyrights and rights to obtain copyrights and renewals and extensions of copyright throughout the world in, to and with respect to the picture and the material.

Wetherly warranted, among other things, that (1) it was the exclusive owner of the picture, the material, and the copyright, and of all rights thereto in the United States and Canada, except for the network television rights previously granted by Navarone to ABC, (2) it had not previously sold, licensed, or granted to any third party any right to the picture, material, or copyright, or to the distribution thereof, (3) the direct production costs of the picture were not less than $9 million, (4) the picture had not been commercially exhibited or exploited previously, and (5) the copyright notice on the picture would be in the name of AIP, for and on behalf of Lionel. Lionel agreed to pay Wetherly $5.6 million, in the manner described below, for the motion picture:

4. In full consideration for the sale of the picture and the material by Seller [Wetherly] to Purchaser [Lionel] and for all of Seller's undertakings hereunder, Purchaser shall pay Seller a purchase price of $5,600,000 payable as follows:

(a) The sum of $230,000 payable concurrently with the execution hereof, receipt of which is hereby acknowledged;

(b) The sum of $330,000 payable on or before February 20, 1979;

(c) The sum of $5,040,000 to be payable only out of the proceeds of the picture, as hereinafter provided, which payment shall be secured by a nonrecourse promissory note in the principal amount of $5,040,000 (which shall bear interest at the rate of nine percent (9%) per annum from and after September 1, 1978), executed by Purchaser in favor of Seller * * * The note shall be payable as follows: Interest only on the note shall be due and payable in the amount of $604,800 on or before December 31,

1979. Principal installments, each in the amount of $450,000, shall be due and payable on or before the 31st day of each December in 1980 and 1981. Principal installments, each in the amount of $828,000, shall be due and payable on or before the 31st day of each December in 1982, 1983, 1984, 1985 and 1986. Interest, including any accrued and unpaid interest shall be payable with each installment of principal. All payments in respect of the note shall be applied first to the accrued and unpaid interest and then against unpaid principal. The principal amount of said note and the interest thereon, as the same shall accrue, are hereinafter referred to as the "remaining balance of the purchase price". The Purchaser's obligation to repay the remaining balance of the purchase price shall be limited to the payment thereof out of such portions of the Purchaser's receipts as provided in Paragraph 6 hereof and in no event shall Purchaser have any other obligation or liability to pay such balance nor may any deficiency judgment be obtained against Purchaser for the payment thereof. If and to the extent Purchaser has not received sufficient receipts pursuant to paragraph 6 below to make the required payments in respect of the note by the scheduled due dates, such unpaid portion of such payment shall be deferred, but in any event the unpaid principal balance of the note and all accrued interest thereon shall become due and payable on December 31, 1986. * * *

5. The term "Purchaser's receipts" as used herein, shall mean the aggregate of all moneys received by Purchaser from Seller[10] pursuant to the [AIP-Lionel] Distribution Agreement.

6. That portion of the Purchaser's receipts represented by the payments referred to in Paragraphs 8(b)(ii) and 8(b)(iii) [Level II] of the [AIP-Lionel] Distribution Agreement shall be paid by Distributor [AIP] to Purchaser, then by Purchaser to Seller on account of Purchaser's obligations to pay interest on and the principal amount of the remaining balance of the purchase price as provided in Paragraph 4(c) hereof. All other Purchaser's receipts, including without limitation, that portion represented by the payments referred to in Paragraph 8(a) [Level I] of the [AIP-Lionel] Distribution Agreement, shall be retained by Purchaser. It is acknowledged and agreed that Seller shall have no right whatsoever in the portion of Purchaser's receipts retained by Purchaser as set forth above; nor may it be diminished in any way by Seller's having to expend any moneys in enforcing or supporting any of the provisions hereof except Purchaser's obligations to pay the amounts set forth in Paragraphs 4(a) and (b) hereof.

Pursuant to such agreement, Lionel executed a $5,040,000 nonrecourse promissory note (the Lionel note), bearing interest at the rate of 9 percent per annum, and payable to Wetherly in installments of principal and interest as described in paragraph 4(c) of the Wetherly-Lionel acquisition

---

[10] This should probably read "Distributor" (AIP) rather than "Seller" (Wetherly).

agreement. The Lionel note was secured by the motion picture and a mortgage on the copyright.

Concurrently with its acquisition of the motion picture, Lionel entered into a distribution agreement with AIP (the AIP-Lionel distribution agreement). The AIP-Lionel distribution agreement was drafted by AIP (with the exception of the paragraphs concerning AIP's license fee, which were drafted by Lionel's attorney) and was substantially identical to the AIP-Navarone distribution agreement. Lionel granted AIP the same exclusive and irrevocable rights with respect to the motion picture as were granted to AIP by Navarone (i.e., exhibition, rental, distribution, advertising, musical, publishing, television series, and ancillary rights in the United States and Canada), but the grant of such rights was for a term of 15 years. Such grant was automatically renewed in perpetuity unless Lionel, within 60 days prior to the end of the 15-year period, advised AIP of Lionel's intention to terminate. In the event that Lionel gave AIP notice of its intention to terminate, AIP had the right to renew the agreement in perpetuity by paying Lionel the motion picture's fair market value at such time, but in no event less than $2,500 nor more than $10,000. Any amount paid by AIP to renew the agreement was recoupable by AIP out of any future amounts due Lionel under the distribution agreement.

The AIP-Lionel distribution agreement further provided that the copyright of the motion picture would be in the name of AIP "for the benefit of" Lionel. AIP was granted, "Subject to Producer's [Lionel's] rights," the "irrevocable, unconditional and unlimited access to the negative and the exclusive right to obtain prints hereunder." AIP and its licensees could cut, edit, or otherwise change the motion picture or its title as AIP deemed necessary in its sole judgment. AIP had the sole, exclusive, and complete control (without let or hindrance by Lionel or any third person) over the leasing, licensing, exploiting, marketing, and distribution of the picture and of the other rights granted to AIP. Lionel's only remedy in the event of a breach of the agreement by AIP was an action for an accounting or for damages; Lionel had no right to terminate or rescind the agreement. Until 1986, the picture was distributable only by

AIP, its subsidiaries or affiliates, or by any entity which succeeded to substantially all of AIP's assets, and the agreement was assignable by AIP only to such entities. After 1986, the picture was distributable by, and the agreement freely assignable to, any person, firm, or corporation designated by AIP. Lionel agreed not to sell, assign, transfer, or convey to any person any right, title, or interest in or to the picture or any part thereof, or in the literary material upon which the picture was based, without AIP's prior written approval.

In return for the distribution rights granted to it, AIP agreed to pay Lionel a license fee divisible into three components or "levels." Under level I, Lionel was to be paid, on a monthly basis, an amount equal to the following percentages of the "gross receipts" of "Force 10 From Navarone":

| Gross receipts | Percentage | Payment |
|---|---|---|
| First $500,000 | 0 | .0 |
| Next $1,000,000 | 8 | $80,000 |
| Next $400,000 | 5 | 20,000 |
| Next $400,000 | 10 | 40,000 |
| Next $400,000 | 5 | 20,000 |
| Next $400,000 | 10 | 40,000 |
| Next $200,000 | 5 | 10,000 |
| Next $700,000 | 10 | 70,000 |
| Next $200,000 | 5 | 10,000 |
| Next $1,400,000 | 15 | 210,000 |
| Next $400,000 | 5 | 20,000 |
| Next $1,000,000 | 10 | 100,000 |
| Next $500,000 | 7 | 35,000 |
| Next $600,000 | 12.5 | 75,000 |
| In excess of $8,100,000 | 5 | - - - |

In addition, in the event that Lionel did not receive $336,000 under level I within 3 years of the motion picture's release, Lionel was entitled to receive, in addition to any amounts otherwise received under level I, an amount equal to 55 percent of all revenues derived by AIP from television exhibition and the exploitation of ancillary rights (less residual payments, print costs for television, and television editing costs) until Lionel recouped $336,000 from all sources.

Under level II, AIP agreed to pay Lionel on a quarterly basis commencing March 31, 1979, an amount equal to 80

percent of the gross receipts remaining after payment of the amounts due under level I, until Lionel had received an amount sufficient to pay in full the principal and interest due on the Lionel note ($5,040,000 plus interest at 9 percent per annum). However, under a holdback schedule, Lionel was in no event entitled to be paid pursuant to level II, on a cumulative basis, more than $604,800 in 1979, $450,000 (plus interest at 9 percent) in each of the years 1980 and 1981, or $828,000 (plus interest at 9 percent) in each of the years 1982 through 1986.

For purposes of level I and level II, the term "gross receipts" was defined in substantially the same manner as such term was defined in the AIP-Navarone distribution agreement: AIP's actual receipts from theatrical and television exhibitors and from the commercial exploitation of all ancillary rights, net of collection costs.

Under level III, Lionel was to be paid, after the Lionel note was paid in full, and in lieu of payments under levels I and II, an amount equal to 100 percent of the "net producer's share of the gross receipts" of "Force 10 From Navarone." However, in no event was the amount payable under level III to be less than the amount that would otherwise be payable under level I. The term "net producer's share of gross receipts" was defined as AIP's gross receipts less its distribution fee, distribution and advertising expenses, and contingent compensation, including deferments, participations in gross receipts becoming payable after breakeven, and a profit participation payable to AIP's subsidiary, American International.

Sometime after the execution of the documents described above, Lionel entered into an acquisition agreement with Deka Associates, Ltd. (Deka), dated October 19, 1978 (the Lionel-Deka acquisition agreement). Deka is the limited partnership whose claimed deductions are at issue here. Under the agreement, which was substantially identical to the Wetherly-Lionel acquisition agreement, Lionel conveyed to Deka all of the rights relating to the motion picture that Lionel had acquired from Wetherly. By separate document, Lionel also assigned to Deka all of Lionel's rights under the AIP-Lionel distribution agreement.

Deka agreed to pay Lionel a total of $5,610,000, or $10,000 more than Lionel had agreed to pay Wetherly. The Lionel-Deka acquisition agreement provided for payment of the purchase price in the following manner:

5. * * *

(a) The sum of $230,000 payable concurrently with the execution hereof, receipt of which is hereby acknowledged;

(b) The sum of $340,000 payable on or before February 20, 1979;

(c) The sum of $5,040,000 to be payable only out of the proceeds of the picture, as hereinafter provided, which payment shall be evidenced by a promissory note in the principal amount of $5,040,000 (the "Note") (which shall bear interest at the rate of nine percent (9%) per annum), executed by Purchaser in favor of Seller * * * . The Note shall be payable as follows: Interest only on the note shall be due and payable in the amount of $604,800 on or before December 31, 1979. Principal installments, each in the amount of $450,000, shall be due and payable on or before the 31st day of each December in 1980 and 1981. Principal installments, each in the amount of $828,000, shall be due and payable on or before the 31st day of each December in 1982, 1983, 1984, 1985, and 1986. Interest, including any accrued and unpaid interest, shall be payable with each installment of principal. All payments in respect of the Note shall be applied first to the accrued and unpaid interest and then against unpaid principal. The principal amount of said Note and the interest thereon, as the same shall accrue, are hereinafter referred to as the "remaining balance of the purchase price." Subject to subparagraph 5(d), the Purchaser's obligation to repay the remaining balance of the purchase price shall be limited to the payment thereof out of such portions of the Purchaser's receipts as provided in Paragraph 6(b) hereof, and in no event shall Purchaser have any other obligation or liability to pay such balance nor may any deficiency judgment be obtained against Purchaser for the payment thereof. If and to the extent Purchaser has not received sufficient receipts pursuant to paragraph 6(b) below to make the required payments in respect of the Note by the scheduled due dates, such unpaid portion of such payment shall be deferred, but in any event the unpaid principal balance of the Note and all accrued interest thereon shall become due and payable on December 31, 1986;

(d) Notwithstanding the provisions of subparagraph (c) above, it is understood and agreed that if and to the extent any principal or interest remains unpaid on the Note on December 31, 1986, then Seller shall have full recourse therefor against the General Partners [sic] of the Purchaser, and the Limited Partners thereof by virtue of their execution of Assumption Agreements in the form attached hereto as Exhibit "B", it being understood and agreed that such recourse against each such Partner shall be limited to the "Maximum Liability" set forth in the Assumption Agreements signed by such Partner and that the liability of the General Partner and the Limited Partners under such Assumption Agreements shall be several and not joint and shall, in all respects, be

subject to the terms and conditions of said Assumption Agreements; *provided, however*, that at such time as the Purchaser has paid to the Seller out of rentals on the picture the sum of $2,016,000 in respect of the Note (principal and/or interest), then the provisions of this subparagraph (d) shall be of no further force and effect, the liabilities of the Partners under the Assumption Agreements shall cease and terminate forthwith, and Seller's sole recourse on the Note for the remaining principal and/or interest thereon shall be limited to the amounts set forth in subparagraph (c) above, and neither Purchaser nor the partners of the Purchaser shall have any other obligation or liability on the Note;

\*    \*    \*    \*    \*    \*    \*

6. (a) The Term "Purchaser's receipts" as used herein shall mean the aggregate of all monies received by Purchaser from AIP pursuant to [AIP-Lionel] Distribution Agreement;

(b) That portion of the Purchaser's receipts represented by the payments referred to in Paragraphs 8(b)(ii) and 8(b)(iii) [level II] of the [AIP-Lionel] Distribution Agreement shall be paid to Seller on account of Purchaser's obligations to pay interest on and the principal amount of the remaining balance of the purchase price as provided in Paragraph 5(c) hereof. All other Purchaser's receipts, including, without limitation, that portion represented by the payments referred to in Paragraph 8(a) [level I] of the [AIP-Lionel] Distribution Agreement, shall be retained by Purchaser. It is acknowledged and agreed that subject only to Paragraph 5(d) hereof, Seller shall have no right whatsoever in the portion of Purchaser's receipts retained by Purchaser as set forth above; nor may such portion be diminished in any way by Seller's having to expend any monies in enforcing or supporting any of the provisions hereof except Purchaser's obligations to pay the amount set forth in Paragraphs 5(a) and (b) hereof.

Subsequently, by letter agreement dated February 21, 1979, Deka and Lionel agreed that the Lionel-Deka acquisition agreement contained certain "typographical errors," which they corrected as follows: the purchase price of the motion picture was $5,625,000 in lieu of $5,610,000, and the cash payment due on or before February 20, 1979, was $355,000 in lieu of $340,000.

In accordance with the Lionel-Deka acquisition agreement, Deka executed a $5,040,000 nonrecourse promissory note (the Deka note), bearing interest at the rate of 9 percent per annum, and payable to Lionel in installments of principal and interest as described in paragraph 5(c) of the Lionel-Deka acquisition agreement. The Deka note further provided that:

This Note is issued pursuant to and subject to all of the terms and conditions of, the Acquisition Agreement and is entitled to the benefits thereof. As set forth in Paragraph 5(d) of the Acquisition Agreement, the General Partners [sic] of the maker and certain Limited Partners thereof have agreed to become personally liable in respect of this Note in the event and to the extent such Note is not paid in full on December 31, 1986, the obligations and liabilities of the General Partners [sic] and such Limited Partners being in all respects subject to the provisions of said Paragraph 5(d) of the Acquisition Agreement and the Assumption Agreements therein described. This Promissory Note is executed on the express condition, and the payee hereof by its acceptance of this Note so agrees, at such time as the maker has made payments on this Note out of rentals received by the maker from the picture described in the Acquisition Agreement in the total amount of $2,016,000 (principal and/or interest), then all personal liability of the General Partners [sic] and such Limited Partners hereon shall cease and terminate forthwith, and be of no further force and effect, and this Note shall thereafter be a non-recourse Note payable only out of certain monies received by the maker as herein and in the Acquisition Agreement described.

The Deka note was secured by the motion picture and by an assignment and mortgage of the copyright.

On October 25, 1978, copyright assignments from AIP to Wetherly and from Wetherly to Lionel were recorded with the Copyright Office of the United States. On May 18, 1979, a copyright assignment from Lionel to Deka and a mortgage and assignment of copyright from Deka to Lionel were recorded with the Copyright Office. Financing statements were filed with the appropriate State officials for the security interests granted by Lionel to Wetherly and by Deka to Lionel.

By check dated September 25, 1978, Lionel paid Wetherly $230,000 pursuant to paragraph 4(a) of the Wetherly-Lionel acquisition agreement as the first installment of the purchase price of "Force 10 From Navarone." Wetherly endorsed the check to the order of American International. On October 2, 1978, Deka transferred $235,000 from its bank account to Lionel's account at the same bank. Deka treated such amount as its first installment of the purchase price due under paragraph 5(a) of the Lionel-Deka acquisition agreement. Lionel subsequently returned $5,000 of such payment as an overpayment. In February 1979, Deka paid Lionel $25,000 and, pursuant to an authorization executed by Lionel, sent Wetherly a check for $330,000 in satisfaction of both Lionel's obligation to Wetherly under para-

graph 4(b) of the Wetherly-Lionel acquisition agreement and Deka's obligation to Lionel under paragraph 5(b) of the Lionel-Deka acquisition agreement as amended by their subsequent letter agreement.

AIP set up a "zero balance" account for Deka at Bank of America to insure that payments made by AIP to Deka (as assignee of Lionel) under level II of the AIP-Lionel distribution agreement would return to AIP on the same day through Wetherly's bank account at Bank of America, pursuant to the terms of the Wetherly-Lionel and Lionel-Deka acquisition agreements. The scheduled level II payments exactly matched the principal and interest payments due on the Lionel and Deka notes, as outlined below:

| Year | Maximum level II payment | Note payment due |
|---|---|---|
| 1979 | $604,800 | $604,800 (interest) |
| 1980 and 1981 | $450,000 + 9% interest on unpaid balance of Lionel note | $450,000 (principal) +9% interest on unpaid balance of notes |
| 1982 - 1986 | $828,000 + interest | $828,000 (principal) + interest |

Deka issued an irrevocable letter of instruction to Bank of America advising the bank that AIP periodically would deposit funds to Deka's account and that such funds should be transferred immediately to Wetherly's account at Bank of America. Funds deposited to Wetherly's account were immediately withdrawn and then deposited in AIP's bank account at Bank of America. Lionel issued a letter to Deka acknowledging that funds deposited by AIP to Deka's zero balance account (and routed thereby to AIP) constituted payments on the Deka note.

Lionel was wholly owned by its president, Sanford Takiff, a friend and former law school classmate of both Mr. Pearl and Mr. Reinsdorf. Although it had previously engaged in the steel-importing business, the company was inactive in 1975 and 1976. In 1977, Mr. Pearl and Mr. Reinsdorf asked Mr. Takiff to take part in TBC Films' motion picture investments. Lionel's role was to purchase a motion picture for cash and a nonrecourse promissory note and simultaneously to license its distribution. Lionel would promptly resell the motion picture and assign the distribution agreement to a limited partnership formed by TBC Films for cash

and a nonrecourse note backed by assumption agreements. Lionel's "fee" for serving as an intermediary was the difference between the amount of cash that it received from the partnership and the amount of cash that it paid to the film's owner. Occasionally, Lionel also retained the right to television syndication revenues. In the present case, Lionel received a $25,000 fee.

Lionel assumed no genuine risk by participating in TBC Films' ventures. Balcor, the marketing agent for TBC Films, was always able to fully fund the partnerships that it syndicated. In addition, Lionel executed only nonrecourse notes, and on all but two occasions, it was paid by the partnerships either before or at the time that it paid the owners of the motion pictures. On one occasion, Lionel was not reimbursed for about a week because the partnership's first check was returned by the bank, and on a second occasion, Mr. Takiff borrowed the money needed for the cash downpayment and lent the money to Lionel until the time the partnership was formed. According to its Federal income tax return for its fiscal year ending June 30, 1979, Lionel had total assets (after depreciation) of only $18,945. The company had no bank lines of credit in 1978.

The only motion picture investments in which Lionel participated were those promoted by Mr. Pearl. Mr. Takiff took no part whatsoever in negotiating the terms of Lionel's agreements relating to "Force 10 From Navarone"; Mr. Pearl negotiated all financial terms of the acquisition and distribution agreements on behalf of Lionel and Deka.

The purchase price for the motion picture was negotiated by Mr. Melamed and Mr. Schwartz (on behalf of AIP and Wetherly) and by Mr. Pearl (on behalf of Lionel and Deka). After meeting with Mr. Pearl in AIP's office, Mr. Schwartz by letter dated June 27, 1978, sent Lionel a memorandum of agreement in which the motion picture's total purchase price was given as $2,800,000, payable in cash of $560,000 ($270,000 due in 1978 and $290,000 due in 1979) and a nonrecourse promissory note of $2,240,000. By letter dated July 6, 1978, Mr. Pearl responded to Mr. Schwartz's letter and made certain changes in the parties' "deal letter," including a change in the price, which Mr. Pearl described as follows:

Paragraph 1, purchase price has been changed from 2.8 million to 5.6 million. Although AIP has only paid 2.8 million[11] for the pickup of the picture, the value of the U.S. and Canadian rights to the picture are a function of the total negative cost which is in excess of 9 million. I have also made changes to the payment schedule to accommodate our specific needs in view of the fact that we will not be purchasing this picture until late August. * * *

Mr. Pearl's suggested purchase price of $5,600,000 was payable in cash of $560,000 ($220,000 due in 1978 and $340,000 due in 1979) and a nonrecourse promissory note of $5,040,000. The total purchase price was established by application of a rule of thumb: when buying only the U.S. and Canadian rights to a motion picture, Mr. Pearl always negotiated a price equal to 60 to 65 percent of the picture's total production costs because, typically, about 60 to 65 percent of a picture's distribution revenues derived from the United States and Canada. Mr. Pearl neither viewed the picture nor secured an independent appraisal of its value before its purchase by Lionel. By letter dated July 12, 1978, Mr. Melamed, on behalf of AIP and Wetherly, accepted Mr. Pearl's changes with respect to the purchase price.

AIP and Wetherly were unconcerned about the amount of the total purchase price; they would have sold the motion picture to Lionel for $560,000 cash, whether or not Lionel also executed a $5,040,000 nonrecourse note, because the note was payable only out of proceeds that AIP itself would supply via the AIP-Lionel distribution agreement. Thus, in Mr. Melamed's words, if "it got to the point where there would be enough proceeds to pay off the nonrecourse note, the money would come back to us." In accounting for the transactions with Lionel, AIP did not record the Lionel note on its books and records and did not treat the transactions as a "sale" of the motion picture.[12] Instead, AIP reduced its basis in the motion picture by the amount of cash paid by Lionel ($560,000). AIP began depreciating its basis in the picture on January 5, 1979. It treated any license fees paid to Deka (as assignee of Lionel under the AIP-Lionel distribu-

---

[11] Mr. Pearl was mistaken; AIP had paid only $2.1 million to pickup the United States and Canadian rights to the motion picture.

[12] Although AIP assigned its rights in the motion picture to its subsidiary, Wetherly, and the subsidiary entered into the acquisition agreement with Lionel, the evidence of record indicates that AIP, not Wetherly, accounted for all transactions with respect to the motion picture and Lionel on its books.

tion agreement) as an expense, as it would any amounts paid to any person that had a profit participation in a picture.

Deka was organized as an Illinois limited partnership in 1978. The partnership had one general partner, TBC Films, and 33 limited partners. A total of $785,000 was contributed to the capital of Deka; of that amount, $349,325 was contributed in 1978, and $435,675 was contributed in 1979. TBC Films made no capital contribution. In accordance with the terms of Deka's limited partnership agreement, the limited partners subscribed for a total of 785 "limited partnership interests" at a price of $1,000 each, payable in installments of $445 on subscription and $555 on February 25, 1979.

The petitioner, Mr. Law, acquired 11.5 limited partnership interests on September 29, 1978. Pursuant to the limited partnership and subscription agreements, he contributed a total of $11,500 to the capital of Deka through payment of $5,117.50 in September 1978 and $6,382.50 in February 1979. Incident to acquiring such interests, he signed an assumption agreement whereby he agreed, in pertinent part:

that if and to the extent rentals from the Film received by the Partnership from time to time are insufficient to enable the Partnership to pay in full any principal of or interest on the * * * [Deka note] when and as the same becomes due and payable on December 31, 1986, then the undersigned shall contribute to the Partnership by way of a capital contribution, such amounts as shall be necessary to enable the Partnership to make such payments on such Debt, PROVIDED HOWEVER, IN NO EVENT SHALL THE UNDERSIGNED'S LIABILITY HEREUNDER EXCEED A TOTAL MAXIMUM AMOUNT OF $46,000.00 (the "Maximum Liability").

It is further understood and agreed that the undersigned's obligations hereunder shall be a primary obligation of the undersigned, and that the undersigned shall have no right of indemnification from or contribution or subrogation against the Partnership, the General Partner thereof or any other person (other than any rights of contribution which the undersigned may have against other partners who have executed agreements of the same nature as this Agreement) it being the intention and understanding of the undersigned that, to the extent of the Maximum Liability, the undersigned shall bear the ultimate risk of loss if and to the extent the Partnership is unable to make payments on the * * * [Deka note] when due, as aforesaid.

In order to effectuate the agreements set forth herein, the undersigned further agrees as follows:

1. If and when the undersigned shall have received notice from the Partnership that any payments on the * * * [Deka note] have become due and payable (whether by virtue of demand by the obligee of said Debt, expiration of the time or otherwise) and that the Partnership has not received sufficient rentals from the Film to make such payments, then the undersigned shall immediately pay over to the Partnership, for application against said Debt, all unpaid amounts then due and owing on said Debt, up to but not exceeding in total the Maximum Liability.

2. The undersigned agrees that the terms of this Agreement shall redound to the benefit of * * * [Lionel] and that * * * [Lionel] may proceed directly against the undersigned pursuant hereto, subject to the terms hereof, provided, however, that in no event shall the undersigned's obligations and liabilities to * * * [Lionel] in total exceed the Maximum Liability.

\* \* \* \* \* \* \*

5. Anything to the contrary herein notwithstanding, this Agreement is executed by the undersigned on the express condition that * * * [Lionel] and the Partnership, by their respective acknowledgments hereof, represent, warrant and agree that the * * * [Deka note] shall provide that the liability of the undersigned in respect of said Debt as set forth in this Agreement shall automatically terminate and be no longer of any force or effect on January 1, 1983, if on that date all accrued interest (estimated to be approximately $1,845,000) on the * * * [Deka note] and at least $900,000 of principal has been paid out of rentals on the Film.[13]

All of the limited partners of Deka executed assumption agreements identical to the one executed by Mr. Law with the exception of the amount of each limited partner's "maximum liability" thereunder. In almost every instance, a limited partner's "maximum liability" was equal to 400 percent of the amount of cash that such partner contributed to the partnership. Mr. Pearl and RGF did not use assumption agreements in the motion picture production partnerships that they formed prior to the enactment of the "at risk" rules in the Tax Reform Act of 1976. When, as TBC Films, they first began forming negative pickup partnerships, they did not require that the limited partners execute assumption agreements, but by 1978, they decided to require that all limited partners execute such agreements

---

[13] According to the Lionel-Deka acquisition agreement and the Deka note, as finally executed, the limited partners' liability under the assumption agreements was to terminate upon the payment of $2,016,000 (principal and/or interest). See text at pages 1078 and 1080. The discrepancy between the assumption agreements and the acquisition agreements and note is unexplained.

because offering a choice was, in Mr. Pearl's words, "such a pain in the neck." Katten, Muchin prepared an informational memorandum which was provided to prospective investors in Deka and which explained the purpose of the assumption agreements as follows:

### "AT RISK" RULES

By virtue of the Tax Reform Act of 1976, an investor in a partnership engaged in the motion picture business can recognize losses only to the extent of his investment "at risk" (i.e., the amount of his actual net cash investment in the Partnership, plus the portion of any Partnership liabilities for which such limited partner is personally liable). To the extent the investor's share of Partnership losses exceeds his investment "at risk", the excess losses are deferred and may, under certain circumstances, be used to offset future income from the Partnership.

Each investor is required to become personally liable for a proportionate share of the Partnership's liability on the $5,040,000 Purchase Price Note, equal to approximately 400% of their cash investment in the Partnership. * * *

*The requirement that an investor become personally liable for a share of the Purchase Price Note materially increases an investor's investment risk.* His maximum loss will not be limited to his cash investment in the Partnership, as is typically the case in limited partnership investments. However, in order to provide some additional protection to investors, an amount equal to the major portion of the "gross receipts" generated by the Film will be available to the Partnership for application against the Purchase Price Note. See "DISTRIBUTION ARRANGEMENT" above. Based on its estimate of the gross recipts [sic] which it believes the Film should generate, the General Partner believes that the amounts received by the Partnership which will be available for application on the Purchase Price Note will be sufficient to provide for the necessary principal ($900,000) and interest (estimated at approximately $1,845,000) payments on the Note to satisfy the requirements for the Note to become non-recourse on January 1, 1983. *However, neither the Distributor, the General Partner, the Seller, nor any other party will guarantee that the Partnership will receive sufficient funds to pay down the Purchase Price Note to the point where it becomes non-recourse. To the extent of the liability assumed, the investor will have the full economic risk of loss.*

See Paragraph 3 under "RISK AND OTHER IMPORTANT FACTORS" and Paragraphs 4 and 18 under "TAX ASPECTS" generally.

[Emphasis in original.]

According to the informational memorandum, Deka was to pay TBC Films an "acquisition fee" of up to $125,000 from the proceeds of the offering "for services in selecting and acquiring the Film." To the extent that any sales

commissions were payable in connection with the sale of partnership interests, they were to be paid by the partnership and would reduce the amount of such "acquisition fee." TBC Films was also entitled from the proceeds of the offering to an "organization fee" of $15,000, a "syndication fee" of $20,000, and a "management fee" of $40,000 (payable $20,000 in 1978 and $20,000 in 1979). Furthermore, TBC Films was entitled to a 1-percent share of the cash distributions of Deka, and when the limited partners as ·a group received cash distributions equal to their total cash investment in Deka, TBC Films was entitled to an additional 19 percent of any additional cash distributions as an "incentive management fee."

TBC Films paid Katten, Muchin a total of $9,806 in 1979 for services rendered by the law firm in 1978 in connection with Deka. Such fee included charges of $7,925 for "income tax work, drafting documents, Distribution Agreement, Purchase Agreement, conferences and all matters relating thereto," $1,579 for expenses incurred by Mr. Pearl and his partner, G.M. Penner, in traveling to New York and Los Angeles, and $302 for telephone, courier, and photocopying expenses. Katten, Muchin's itemized bill was identical to the one issued to TBC Films for services rendered in connection with the formation of Hart Associates, Ltd., the partnership involved in *Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986), the companion case to the present case. Both Deka and Hart were organized at about the same time, and Katten, Muchin performed work relating to both partnerships simultaneously. Katten, Muchin split its bill for the combined work equally between Deka and Hart. The trips by Mr. Pearl and Mr. Penner to New York related only to the activities of Hart, not Deka.

The motion picture "Force 10 From Navarone" was first exhibited on December 6, 1978, when Columbia Pictures released it in South Africa. AIP released the picture in the United States and Canadian theatrical markets on December 22, 1978. Prior to its release, the motion picture received favorable reviews by critics writing for "Variety" and "The Hollywood Reporter," motion picture trade newspapers. One critic opined that the picture had a strong box

office outlook, while the other wrote that the picture was "the action adventure movie of the year." Before the motion picture was released, its producer, Navarone, anticipated that it would generate worldwide gross receipts of about $20 million.

Through September 30, 1983, AIP reported gross receipts and made level I payments to Deka based on such gross receipts as follows:

| Year | Accounting through | Cumulative gross receipts | Payments |
|------|--------------------|---------------------------|----------|
| 1978 | 12/23/78 | $32,250.00 | 0 |
| 1979 | 9/29/79 | 3,680,390.74 | $248,039.07 |
| 1980 | 9/26/80 | 4,480,126.60 | 83,939.92 |
| 1981 | 12/26/80 | 4,488,251.98 | [1]4,021.01 |
| 1982 | 9/24/82 | [2]4,339,230.28 | 0 |
| 1983 | 9/30/83 | 4,589,095.23 | 12,364.28 |

[1]This figure includes $2,762.20 paid to Deka pursuant to the level I provision that if Deka (ad assignee of Lionel) did not receive $336,000 under level I within 3 years of the motion picture's release, then Deka was entitled to receive, in addition to any amounts otherwise received under level I, an amount equal to 55 percent of all revenues derived from television and ancillary rights until Deka recouped $336,000 from all sources.

[2]In 1981, pursuant to a renegotiated television agreement with Home Box Office (HBO), AIP repaid $250,000 of $400,000 that HBO had previously advanced to AIP as a license fee for the television rights. AIP's gross receipts were reduced by $250,000 to reflect such repayment.

Deka distributed most of the level I payments to its partners. Through 1983, the petitioner received the following distributions from Deka:

| Year | Amount |
|------|--------|
| 1978 | 0 |
| 1979 | $3,407 |
| 1980 | 1,152 |
| 1981 | 0 |
| 1982 | 173 |
| 1983 | 0 |

AIP's distribution reports stated that AIP made level II payments to Deka and that AIP allocated such payments between the principal and interest due under the Deka and Lionel notes[14] as follows:

[14] On its partnership returns, Deka claimed deductions for interest on the Deka note that varied in amount from the interest allocations made by AIP. The discrepancies are unexplained.

| Year | Level II payments | Principal | Interest |
|------|------------------:|----------:|---------:|
| 1978 | 0 | 0 | .0 |
| 1979 | $604,800.00 | 0 | $604,800 |
| 1980 | 873,225.00 | $450,000.00 | 423,225 |
| 1981 | 832,725.00 | 450,000.00 | 382,725 |
| 1982 | 891,834.22 | 575,124.22 | 316,710 |
| 1983 | 190,000.00 | 0 | 190,000 |

In 1979 through 1981, AIP deposited checks, made payable to Deka and totaling the amounts listed above for such years, to Deka's zero balance account at Bank of America. The funds were then immediately transferred through Wetherly's account and back to AIP's account. In 1982, AIP deposited a check for $871,795.14 to Deka's account, which amount immediately passed through Wetherly's account and back to AIP, but it is not clear from the record that any subsequent payments were actually deposited in Deka's account.

Deka has received no payments under level III. The level of gross receipts required before payments would be due to Deka under level III was so high that Mr. Pearl knew level III "wasn't even relevant."

Deka's Federal partnership returns were filed on a calendar year basis and were prepared by use of the cash method of accounting. The table on page 1090 summarizes the income and expenses reported on the partnership's returns for 1978 through 1983.

The partnership claimed a depreciable cost basis in the motion picture of $5,725,174 in 1978 and $5,709,520 in 1979 through 1981. The cost basis in 1978 was calculated by adding the motion picture's purchase price under the Lionel-Deka acquisition agreement before amendment by the parties' letter agreement ($5,610,000) to the amount of the "acquisition fee" due TBC Films ($125,000 less $9,826 of commissions paid in connection with the sale of partnership interests). The cost basis in 1979 and thereafter was increased by $15,000 to account for the additional purchase money due Lionel under the letter agreement and then was reduced by $30,654 to account for the payment of an additional $30,654 of sales commissions because such commissions reduced the acquisition fee due TBC Films. In 1978, Deka used the double declining balance method of

| | 1978 | 1979 | 1980 | 1981 | 1982 | 1983 |
|---|---|---|---|---|---|---|
| Gross receipts | - - - | $852,839 | $957,175 | $526,746 | $1,201,834 | $202,365 |
| Interest | - - - | 96 | 986 | 2,933 | 2,359 | - - - |
| Total income | - - - | 852,935 | 958,161 | 529,679 | 1,204,193 | 202,365 |
| Expenses | | | | | | |
| Depreciation | $931,218 | 1,638,275 | 1,638,275 | 1,501,752 | - - - | - - - |
| Interest | - - - | 543,060 | 427,999 | 129,691 | 579,593 | 237,117 |
| Guaranteed payments to partners | 20,000 | 20,000 | - - - | - - - | - - - | - - - |
| Amortization of organization fee | 1,000 | 3,000 | 3,000 | 3,000 | 3,000 | 2,000 |
| Taxes | - - - | - - - | - - - | - - - | - - - | 8,780 |
| Bank charges | - - - | 20 | - - - | - - - | - - - | - - - |
| Miscellaneous | 17 | - - - | - - - | - - - | 11,500 | - - - |
| Total expenses | 952,235 | 2,204,355 | 2,069,274 | 1,634,443 | 594,093 | 247,897 |
| Ordinary income (loss) | (952,235) | (1,351,420) | (1,111,113) | (1,104,764) | 610,100 | (45,532) |

depreciation over a 38-month useful life. In 1979 through 1981, Deka employed the straight line method, a 35-month useful life, and no salvage value. The claimed deductions for organization costs resulted from the amortization of a $15,000 "organization fee," paid to TBC Films in 1978, under the straight line method over a 5-year period. The claimed deductions for "guaranteed payments to partners" were for "management fees" of $20,000 paid to TBC Films in 1978 and 1979. On its 1978 return, Deka also reported an investment of $500,000 in property qualified for an investment tax credit.

During 1978 and 1979, Mr. Law had a percentage interest of 1.450319 in Deka's profits and losses. On their Federal income tax returns, the petitioners claimed losses of $13,810 in 1978 and $19,600 in 1979 as Mr. Law's distributive shares of Deka's partnership losses for such years. In 1978, they also claimed $7,251 as Mr. Law's pro rata share of Deka's investment in property qualified for an investment tax credit. In his notices of deficiency, and by amendment of his answers, the Commissioner has disallowed all of Deka's claimed deductions in 1978 and 1979 and Deka's claimed investment in qualified property. The Commissioner therefore disallowed the entire amounts of Mr. Law's reported loss and credit in 1978, and he further determined that Mr. Law had income of $12,370 from Deka in 1979.

## OPINION

The present case and *Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986), are companion cases selected as representative test cases for a large number of dockets involving investors in motion picture partnerships promoted by TBC Films. The issues presented here are similar to those presented in *Tolwinsky*; but the structure of the transactions involved here differ in that the producer of the motion picture, Navarone, sold all rights to the motion picture (excepting rights to three network broadcasts) in the United States and Canada to the distributor, AIP, and it is the distributor and its subsidiary that entered into the acquisition and distribution agreements with Lionel (and thus with

the limited partnership, Deka).[15] We shall rely upon and refer to our reasoning in *Tolwinsky* to the extent permitted by the factual similarities of the cases.

The first issue for decision is whether Deka acquired a depreciable interest in the motion picture "Force 10 From Navarone." The Commissioner bears the burden of proof with respect to this issue, having raised it for the first time by amendment of his answers. Rule 142(a), Tax Court Rules of Practice and Procedure.[16] However, as in *Tolwinsky*, we shall examine the role of certain parties to the transactions involved here before we determine the nature of the interest acquired by Deka. Cognizant that Mr. Pearl and his partners in TBC Films employed a similar format in all of TBC Films' investments and on the basis of the evidence of record, we conclude that Wetherly and Lionel were merely "pass-through" or "strawman" entities inserted in the chain of title between AIP and Deka for obvious tax planning purposes.

Wetherly was a wholly owned subsidiary of American International, which in turn was a wholly owned subsidiary of AIP. The three companies filed consolidated tax returns. Funds deposited into Wetherly's bank account were immediately transferred to the account of AIP. The record is devoid of any evidence indicating a business purpose that may have been served by the interjection of Wetherly. Mr. Melamed, the executive vice president of AIP, could not recall or explain why AIP first assigned its interest in the motion picture to Wetherly rather than selling it directly to Lionel, but he testifed that it had no bearing on "the economics of the deal." Moreover, the evidence of record indicates that AIP, not Wetherly, accounted for all transactions with respect to the motion picture and Lionel on its books. Like the role of Great Lakes Holding Co. Est. in *Tolwinsky*, Wetherly's insertion into these transactions created the appearance of a three-party transaction (AIP, Wetherly, and Lionel), rather than a two-party, sale-

---

[15] In *Tolwinsky v. Commissioner*, 86 T.C. 1009 (1986), the producer of the motion picture, EMI Films, Inc., granted certain exclusive distribution rights to Universal Pictures and then through Great Lakes Holding Co. Est. and British Lion, Inc., entered into an acquisition agreement and a distribution agreement, respectively, with Lionel (and thus with the limited partnership, Hart Associates, Ltd.).

[16] Any reference to a Rule is to the Tax Court Rules of Practice and Procedure.

leaseback transaction (AIP and Lionel). Where transactions serve no "purpose, substance, or utility apart from their anticipated tax consequences," they are disregarded for tax purposes. *Goldstein v. Commissioner*, 364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965); see also *Knetsch v. United States*, 364 U.S. 361 (1960).

The record also establishes that Lionel's insertion into these transactions served no business purpose. As in *Tolwinsky*, the petitioners contend that Lionel's participation was necessitated by the reluctance of movie companies to do business directly with unformed and unfunded partnerships. For the reasons stated in *Tolwinsky* and based on the evidence of record, we conclude that the Commissioner has proven that the only purpose served by the interposition of Lionel between AIP and Deka was to create the appearance of "risk" to Deka's partners for purposes of the "at risk" provisions of section 465 of the Internal Revenue Code of 1954.[17] Lionel "purchased" "Force 10 From Navarone" for cash and a nonrecourse note, yet "resold" the motion picture to Deka for cash and a nonrecourse note backed by assumption agreements under which Deka's limited partners assumed personal liability for a portion of Deka's debt. Lionel did not need the assumption agreements to protect any financial interest: Lionel retained no interest in the proceeds of AIP's distribution of the film; its interest was limited to the $25,000 difference between the cash that it paid under the Wetherly-Lionel acquisition agreement and the cash that it received under the Lionel-Deka acquisition agreement.

Furthermore, we are convinced that Lionel never intended to enforce the assumption agreements if they became effective. It is significant that the Lionel-Deka acquisition agreement and the Deka note did not specify the amount of personal liability assumed by the partners; an amount, usually equal to 400 percent of the partner's cash investment, was merely inserted in each assumption agreement at the time of the partner's subscription. It is also significant that the acquisition agreement and note stated that the partners' personal liability would terminate on payment of

---

[17] All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue, unless otherwise indicated.

$2,016,000 of principal and interest, whereas the assumption agreements specified that personal liability terminated on payment of about $2,745,000. These facts strongly suggest that Lionel did not take the partners' assumption of personal liability seriously. Moreover, the informational memorandum provided to Deka investors emphasized that the execution of assumption agreements was necessary if the partners were to be able to recognize all of Deka's anticipated tax losses. Prior to 1978, TBC Films allowed investors the option of executing or not executing assumption agreements; in 1978, all investors were required to execute assumption agreements because, in Mr. Pearl's words, allowing investors the option of being or not being "at risk" was a "pain in the neck." Such statements reveal that Lionel did not demand the assumption of personal liability, and despite Mr. Takiff's protestations to the contrary, we are convinced that Lionel would never have enforced the assumption agreements. It is obvious that Mr. Pearl and Mr. Reinsdorf, friends and former law school classmates of Mr. Takiff, invited him to participate, through Lionel, in TBC Films' motion picture ventures in order to allow the investors to be "at risk" for tax purposes without being at any genuine risk of loss. We therefore conclude that the assumption agreements did not represent bona fide obligations and that they and Lionel must be disregarded for purposes of determining the true nature of the interest acquired by Deka and the tax liabilities of its partners.

Turning now to the issue of the nature of the interest acquired by Deka, we find our decision in *Tolwinsky* and the principles relied upon therein to be controlling. In that case, as in a number of other cases decided by this and other courts, we refused to permit the transfer of formal legal title to shift the incidence of taxation attributable to ownership of the property where the transferor continued to retain significant control over the property transferred. See also *Helvering v. Clifford*, 309 U.S. 331 (1940); *Helvering v. F. & R. Lazarus Co.*, 308 U.S. 252 (1939); *Hilton v. Commissioner*, 74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); *Miller v. Commissioner*, 68 T.C. 767 (1977). More specifically, we determined that where the transferor of title

to a motion picture negative and the copyright therein retained all substantial rights in the motion picture copyright, the transferee acquired no depreciable interest in the motion picture.

An examination of the written agreements and surrounding circumstances present here reveals that Deka acquired no substantial rights in the motion picture but only a participation in the proceeds of its exploitation. Although AIP (through Wetherly and Lionel) purported to convey ownership of the motion picture and the copyright thereto to Deka, AIP retained complete and exclusive control over the motion picture, effectively in perpetuity, by virtue of the simultaneously negotiated and executed AIP-Lionel distribution agreement.

The AIP-Lionel distribution agreement was drafted by AIP (with the exception of the provisions relating to the "license fees" of levels I, II, and III) and was substantially identical to the AIP-Navarone distribution agreement. The parties agree (and we concur) that Navarone sold the motion picture and the copyright thereto in the United States and Canada to AIP. Under their agreement, Navarone, in return for about $2.1 million cash, and the right to 100 percent of the net producer's share of gross receipts (if any), granted AIP the exclusive, perpetual, and irrevocable "right, license and privilege under copyright to rent, lease, exhibit, distribute, reissue, deal in and with respect to the Picture and prints or any part thereof, and trailers thereof, and to license others to do so." The grant of rights expressly included all marketing, advertising, and publication rights, all musical rights (including the right to make and sell phonorecords of the soundtrack), all radio and television series and specials rights, and "all other ancillary and subsidiary rights in connection with the Picture, including, without limiting the generality of the foregoing, so-called merchandising rights and commercial tie-ups." AIP also had the exclusive right to obtain copies (prints) of the motion picture and the right to cut, edit, or otherwise change the motion picture. The AIP-Navarone distribution agreement was freely assignable by AIP. Such an unrestricted and exclusive grant of rights effected a sale of the motion picture film and copyright for tax purposes (*Tolwinsky v.*

*Commissioner, supra; Carnegie Productions, Inc. v. Commissioner,* 59 T.C. 642 (1973); *Fields v. Commissioner,* 14 T.C. 1202 (1950), affd. 189 F.2d 950 (2d Cir. 1951)) and copyright law purposes (17 U.S.C. secs. 101, 201(d)(1), 204(a) (1982)). Deka (through Lionel) granted AIP the same exclusive and irrevocable rights under the AIP-Lionel distribution agreement. Although the distribution agreements differed as to their duration, assignability, and allocation of gross receipts, none of such differences was significant.

First, the term of the AIP-Lionel distribution agreement was 15 years, but as a practical matter, the grant of the rights therein was perpetual.[18] By its express terms, the agreement was automatically renewed in perpetuity unless Deka gave AIP notice of its intention to terminate the agreement within 60 days prior to the end of the 15-year period, and even if Deka gave such notice, AIP could renew the agreement in perpetuity by paying Deka the motion picture's fair market value at such time, but in no event less than $2,500 nor more than $10,000 (which sum was recoupable out of any amounts thereafter due Deka under the agreement).

Second, unlike the AIP-Navarone distribution agreement, the AIP-Lionel distribution agreement, and the distribution rights granted thereunder were not freely assignable by AIP until 1986. This provision reflected Deka's reliance upon AIP's expertise in distributing motion pictures as security for Deka's financial interest in the gross receipts of "Force 10 From Navarone." The provision did not significantly limit AIP's rights because it could still license others to distribute the motion picture, as it did, for example, with HBO. See note 2, page 1067, *supra.* Under these circumstances, the temporary restraint on alienation does not negate a sale of all substantial rights. See *Watson v. United States,* 222 F.2d 689, 691 (10th Cir. 1955). Moreover, we observe that the AIP-Lionel distribution agreement also provided that Deka (as assignee of Lionel) could not sell, assign, transfer, or convey to any person any right, title, or

---

[18] We express no opinion as to whether a grant for a fixed term (i.e., less than perpetual or the duration of the copyright) might convey ownership for depreciation purposes, but we observe that a grant for "the entire period of substantial exploitation of the film" may convey an "ownership interest" for purposes of the investment tax credit. Sec. 1.48-8(a)(2), (4), Income Tax Regs.

interest in or to the picture or any part thereof, or in the literary material upon which the picture was based, without AIP's prior written approval. Deka's right to alienate the property that it purportedly owned was thus even more restricted than AIP's. Read together, the two provisions support our ultimate conclusion that Deka purchased only a participation in AIP's interest in the gross receipts of "Force 10 From Navarone."

Third, the petitioners emphasize that the method of calculating the payments due Navarone and Deka differed significantly, but they fail to explain the relevance of such difference. Navarone received a $2.1 million production advance and was entitled to 100 percent of the net producer's share of gross receipts. Deka was entitled to payments equaling varying percentages of AIP's gross receipts under levels I and II.[19] Thus, payments to both Navarone and Deka were contingent at least to some extent on the success of the motion picture.

Deka gave AIP (through Lionel and Wetherly) $560,000 cash and a $5,040,000 nonrecourse note in return for the motion picture rights purportedly conveyed to Deka. The cash payment reduced AIP's financial risk with respect to the motion picture, but such payment, without more, does not give the partnership a depreciable interest in the motion picture. As explained by the Supreme Court in *Helvering v. F. & R. Lazarus Co.*, 308 U.S. at 254, a deduction for exhaustion and wear and tear is granted to a person who uses property in his trade or business and incurs a "loss resulting from depreciation of capital he has invested." In the seminal case of *Gladding Dry Goods Co. v. Commissioner*, 2 B.T.A. 336 (1925), the lessee of a store paid for improvements to the property in return for an extension of the lease. The Board of Tax Appeals held that the lessee was entitled to depreciate the cost of such improvements over the lease term as extended. The Board explained that depreciation "is not predicated upon ownership of the property, but rather upon an investment in property which is thereafter used. * * * The material elements are, the

---

[19] Under level III, Deka was entitled to payments equal to 100 percent of the net producer's share of gross receipts, which term was defined differently than under the AIP-Navarone Productions distribution agreement. However, because there was no likelihood of payments becoming due Deka under level III, Mr. Pearl considered it irrelevant.

person who makes the investment, use of the property, and the period over which that investment is to be recovered out of income." 2 B.T.A. at 338-339. Here, AIP retained complete and exclusive control over the motion picture. The only interest relinquished to Deka was a participation in AIP's gross receipts.[20] Cf. *Tolwinsky v. Commissioner, supra.*

Our conclusion that Deka purchased only a participation in the gross receipts generated by the motion picture is supported by the circumstances surrounding the execution of the acquisition and distribution agreements and the economic unreality of Deka's nonrecourse note[21] and the level II payments with which it was retired. AIP's involvement with Deka, as well as with other partnerships formed by TBC Films, reflected its company policy of bringing in third-party participants who would contribute cash in return for a percentage participation in a motion picture's receipts. AIP thereby sought to increase its available capital for motion picture production costs and advertising. That AIP viewed its transaction with Deka as involving a sale of a participation for cash only is further reflected by the fact that AIP accounted for the transaction as a participation rather than as a sale of the motion picture and depreciated its investment in the picture, reducing its depreciable basis only by the amount of cash paid by Deka ($560,000).

As in *Tolwinsky,* the nonrecourse note given to the seller, AIP, did not represent a genuine debt or investment in the motion picture. The principal and interest payments on the note were payable only out of the level II payments made by AIP under the AIP-Lionel distribution agreement. Like the level I payments, the level II payments were computed on the basis of AIP's gross receipts. AIP routed the level II payments, which were exactly equal to the amounts due under the note, through Deka's blocked bank account and Wetherly's account and back to itself in a single day. While use of a nonrecourse note and a sale-leaseback device in which rent payments are geared to interest and amortiza-

---

[20] The petitioners make no claim that Deka was engaged in a joint venture with AIP.

[21] For purposes of our discussion, we shall refer to the nonrecourse obligation owed AIP (through its subsidiary Wetherly) as the Deka note, although the Lionel note was actually given to Wetherly and the Deka note was given to Lionel. The principal amount and repayment terms of both notes were identical.

tion on the note does not necessarily deprive the debt of its character as genuine indebtedness (see *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1047 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Hilton v. Commissioner*, 74 T.C. at 348)), such transactions are subject to special scrutiny due to the "obvious opportunities for trifling with reality" (*Elliott v. Commissioner*, 84 T.C. 227, 244 (1985)). Careful consideration of the facts in this case convinces us that the nonrecourse note and the level II payments with which it was retired were mere paper transactions, wholly lacking in economic substance. Cf. *Knetsch v. United States*, *supra*; *Tolwinsky v. Commissioner*, *supra*; *Karme v. Commissioner*, 73 T.C. 1163 (1980).

From AIP's point of view, the size of the note and of the corresponding level II payments was irrelevant because AIP was never out-of-pocket for the level II payments and its financial risk was not reduced by the retirement of the note. In fact, Mr. Melamed, the executive vice president of finance of AIP, testified that AIP would have "sold" the motion picture for $560,000 cash regardless of whether or not it also received a nonrecourse note. AIP's and Deka's total unconcern about the obligations under level II and the note was also reflected by AIP's willingness to increase the purchase price of the motion picture from $2.8 million to $5.6 million through a $2.8 million increase in the size of the note at the suggestion of Deka's representative, Mr. Pearl.

For its part, Deka was not financially affected by the retirement of the note. Only the level I payments were available for distribution to Deka's partners, and such payments depended on AIP's achieving certain levels of gross receipts, not on the retirement of the note. As AIP reached a particular level of gross receipts, AIP sent Deka a check for the level I amount due and automatically routed the level II payment through the bank accounts and back to itself. No benefit, either through current payments or through the buildup of equity valuable in the future, accrued to Deka as a result of the retirement of the note. See *Estate of Franklin v. Commissioner*, *supra*. That the note was secured by the motion picture is insignificant. If AIP never attained the level of gross receipts required to

pay off the note, resulting in nonpayment on the note, AIP could not foreclose on the motion picture until December 31, 1986, a date beyond its economic useful life (as claimed by Deka in calculating its depreciation deductions). AIP could not recover level I payments previously made.

Where the other available evidence establishes that the partnership purchased only a participation in gross receipts and not the motion picture itself, we think it irrelevant to the determination of the genuineness of the nonrecourse note that the total "purchase price" agreed to by the parties may have equaled the fair market value of the motion picture. *Tolwinsky v. Commissioner, supra.*[22] AIP was willing to, and in effect did, sell the right to the contingent payments under level I for $560,000 cash. It is overwhelmingly obvious that the nonrecourse note and level II payments served no "purpose, substance, or utility apart from their anticipated tax consequences" (*Goldstein v. Commissioner*, 364 F.2d at 740)—a tenfold increase in the partnership's depreciable basis and substantial interest deductions. That Deka reported the level II payments as income was mere window-dressing designed to give the appearance of economic reality to the underlying transactions.

Having concluded that AIP, and not Deka, was the actual owner of the motion picture, it follows that Deka was not entitled to claim deductions for depreciation of the motion picture. However, Deka was entitled to depreciate its contractual right to participate in AIP's gross receipts. *Tolwinsky v. Commissioner, supra.* The next issue for

---

[22] In a number of cases involving the sale of a motion picture or book for cash and a nonrecourse note, we have held that the nonrecourse note did not represent a genuine indebtedness or investment in the property purchased because the petitioner failed to prove that the fair market value of the property equaled or exceeded its purchase price or the amount of the nonrecourse note. See, e.g., *Fuchs v. Commissioner*, 83 T.C. 79 (1984); *Siegel v. Commissioner*, 78 T.C. 659 (1982); *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695·(11th Cir. 1984). We reasoned that:

"No such actual investment will exist to the extent of the amount of the nonrecourse note where the stated purchase price of the property securing the note exceeds a reasonable estimate of its existing fair market value since the purchaser would be acquiring no equity in the property by making payments and, therefore, would have no economic incentive to pay off the note. * * *" [*Brannen v. Commissioner*, 78 T.C. at 493 (relying on *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), and *Hager v. Commissioner*, 76 T.C. 759 (1981)).]

In those cases, the Commissioner did not challenge the purchaser's ownership of the motion picture or book.

decision is therefore the amount of its depreciable basis and the allowable method of depreciating such basis.[23]

Deka claimed a depreciable basis of $5,725,174 on its 1978 return, which basis was comprised essentially of the following:

| | |
|---|---:|
| Cash paid to AIP (through Wetherly)............ | $560,000 |
| Cash due Lionel............................... | 10,000 |
| Promissory note ............................. | 5,040,000 |
| "Acquisition fee" due TBC Films less sales commissions paid in connection with sale of partnership interests ........................ | 115,174 |
| | 5,725,174 |

In 1979, Deka claimed a depreciable basis of $5,709,520; such basis was calculated by increasing the basis claimed in 1978 by $15,000 to account for additional cash paid Lionel and then reducing the basis by $30,654 to account for the payment of additional sales commissions because such commissions reduced the size of the "acquisition fee" due TBC Films.

In his notices of deficiency, the Commissioner did not contest the basis claimed by Deka. However, by amendment of his answers, the Commissioner asserted that Deka's basis did not exceed $570,000 (the total amount of cash due AIP and Lionel under the original acquisition agreements). He now contends that Deka's basis was limited to $224,000, i.e., the cash paid AIP less $336,000, because the cash paid Lionel was not properly includable in basis and $336,000 of the $560,000 paid AIP actually constituted an interest-free loan to AIP. Under the AIP-Lionel distribution agreement, if Deka did not receive $336,000 of level I payments within 3 years of the motion picture's release, Deka was entitled to receive an amount equal to 55 percent of all revenues derived by AIP from television and the exploitation of ancillary rights until Deka recouped $336,000 from all sources. AIP paid Deka $2,762.20 pursuant to such provision in 1981. The Commissioner contends that the provision guaranteed Deka a return of at least $336,000 because in 1978, AIP allegedly knew that it had sufficient rental commitments for the picture to cover almost all of the $336,000. The petitioners contend that the Commissioner's

---

[23] The property's salvage value (or lack thereof) and economic useful life are not at issue.

"loan" argument is a new matter not properly before the Court. The Commissioner raised his "loan" argument for the first time in his pre-trial brief, and then only in an extremely vague manner. For the reasons stated in *Tolwinsky*, which are equally applicable here, we think that consideration of the Commissioner's loan argument at this time would unfairly prejudice the petitioners. See also *Estate of Horvath v. Commissioner*, 59 T.C. 551, 555-557 (1973). Accordingly, we decline to consider such argument. We emphasize that we are expressing no opinion regarding our resolution of such issue had it been properly raised. However, we do not think the petitioners are prejudiced if we consider whether the cash paid Lionel was properly includable in basis; the role of Lionel in these transactions was put at issue by the Commissioner's amended answers, and the petitioners had ample notice and opportunity to present evidence on such issue at trial.

The Commissioner bears the burden of proving that Deka's basis was limited to $560,000, the total cash paid to AIP. We have already concluded that Lionel served no business purpose in the transaction between AIP and Deka. The $25,000 that Lionel received from Deka was obviously only a fee paid to Mr. Takiff for allowing his company to be used to create the appearance of "risk" to Deka's partners, so that they could deduct the full amount of Deka's purported losses. Because such fee was unrelated to the acquisition of Deka's income interest, it was not properly chargeable to the basis of such interest. Sec. 1016; *Tolwinsky v. Commissioner, supra.*

We have also concluded that the $5,040,000 note was not a bona fide indebtedness. A bogus debt does not reflect an investment in the property acquired, and consequently, it cannot be included in Deka's depreciable basis. *Estate of Franklin v. Commissioner, supra*; *Siegel v. Commissioner*, 78 T.C. 659 (1982); *Brannen v. Commissioner*, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984).

Deka's claimed basis included a $115,174 "acquisition fee" (reduced to $84,520 in 1979) due TBC Films. According to the informational memorandum provided to Deka investors, the payment was for TBC Films' services in finding the motion picture and negotiating its purchase. The Commis-

sioner contends that such fee was actually a payment for TBC Films' assistance in selling partnership interests. Syndication fees are not deductible, either as expenses or through amortization. Sec. 709(a); *Estate of Thomas v. Commissioner*, 84 T.C. 412 (1985). Since the proof in support of such allegation is no greater than that present in *Tolwinsky*, we conclude, as we did in that case, that the Commissioner has failed to prove that the acquisition fee was not properly chargeable to Deka's basis.

In summary, we conclude that Deka's basis for depreciation was limited to the $560,000 cash paid to AIP plus the $84,520 acquisition fee paid to TBC Films.

The next issue for decision is the allowable method of depreciation. On its returns, Deka depreciated its claimed investment in the motion picture under the double declining balance method in 1978 and the straight line method in 1979. In his notices of deficiency, the Commissioner determined that Deka must use the income forecast method. He now concedes for purposes of this case that Deka could employ the straight line method in 1979. The petitioners contend that use of the income forecast method is optional. They also argue that the issue of whether Deka could use the declining balance method is not properly before the Court. We think that the latter issue was raised by the notice of deficiency because a determination that the partnership must use the income forecast method necessarily encompassed a determination that the method used, declining balance, was unacceptable.

Section 167(c) prohibits use of the declining balance method to depreciate intangible property. Since a contractual right to participate in a motion picture's gross receipts is an intangible asset (*Tolwinsky v. Commissioner, supra*; B. Bittker, Federal Taxation of Income, Estates and Gifts, par. 23.2.6, at 23-2 (1981)), Deka was not entitled to use the declining balance method in 1978. However, Deka was not required to employ the income forecast method. Section 167(a) provides that there shall be a "reasonable allowance" for the exhaustion wear and tear (including obsolescence) of property used in a trade or business or held for the production of income. Under section 167(b), a "reasonable allowance" includes an allowance computed under the

straight line method, which method is available to depreciate tangible and intangible property. Sec. 167(c). Section 1.167(b)-1, Income Tax Regs., states: "The straight line method may be used in determining a reasonable allowance for depreciation for any property which is subject to depreciation under section 167 and it shall be used in all cases where the taxpayer has not adopted a different acceptable method with respect to the property."[24] The petitioners request that Deka be permitted to employ the straight line method in 1978 if we determine that the declining balance method was unacceptable. Generally, a change in a taxpayer's method of depreciation constitutes a change in the taxpayer's method of accounting, which normally requires the consent of the Commissioner. See sec. 446(e); sec. 1.167(e)-1, Income Tax Regs. However, such consent is not required where the taxpayer initially chose an unacceptable method of depreciation and then seeks to adopt the straight line method. See sec. 167(e)(1); sec. 1.167(b)-1 and (e)-1, Income Tax Regs.; Rev. Rul. 72-491, 1972-2 C.B. 104; cf. *Silver Queen Motel v. Commissioner*, 55 T.C. 1101 (1971). We therefore conclude that Deka is entitled to a depreciation deduction computed under the straight line method in 1978.

On its 1979 partnership return, Deka deducted $543,060 as "interest" paid on the Deka note. We have already determined that the note (and the level II payments with which it was payable) was a sham, and consequently, no interest deductions are allowable with respect to the note. *Knetsch v. United States, supra; Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971); *Karme v. Commissioner, supra.* Because the level II payments were likewise a sham, wholly lacking in economic substance, we also hold that such payments were not includable in income in 1979.

---

[24] Neither party has cited sec. 280, which requires individuals to capitalize the production costs of motion pictures and certain other properties produced after 1975 and to amortize such costs under an income forecast method. Enacted as part of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, sec. 280 was aimed at the so-called production company shelter: a partnership which was formed to produce (but not own) a motion picture and which used the cash method of accounting and expensed the costs of production as they were paid; typically, the partnership was heavily leveraged, and significant costs were paid with borrowed funds. S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 109-117; see, e.g., *Estate of Helliwell v. Commissioner*, 77 T.C. 964 (1981). Without deciding the issue, we observe that sec. 280, on its face, appears not to apply to an income interest like the one purchased by the partnership here.

In 1978, Deka deducted $20,000 for a guaranteed pay-
ment (a "management fee") to its general partner, TBC
Films, $1,000 for amortization of a $15,000 "organization
fee" paid to TBC Films, and $17 for unspecified "miscella-
neous" expenses. In 1979, Deka deducted $20,000 for a
guaranteed payment to TBC Films, $3,000 for amortization
of the organization fee, and $20 for "bank charges." In his
notices of deficiency, the Commissioner disallowed such
deductions in their entirety. The petitioners bear the burden
of proving that the Commissioner's determination was in
error. Rule 142(a); *Welch v. Helvering*, 290 U.S. 111 (1933).
As in *Tolwinsky*, the petitioners rely upon the testimony of
Joseph Kruszynski, a partner in RGF and the chief financial
officer of TBC Films and Balcor, to substantiate the services
provided by TBC Films in return for the management and
organization fees. His testimony was no more detailed here
than it was in *Tolwinsky*. Therefore, for the reasons stated
in *Tolwinsky*, we conclude that the petitioners have failed
to prove that Deka is entitled to any deduction for the
management fee or that Deka's amortizable organization
expenses exceeded $4,000 (the amount that we estimate was
paid to Katten, Muchin for legal services rendered in
connection with the organization of Deka). Because there is
no evidence of record substantiating Deka's claimed deduc-
tions for miscellaneous expenses and bank charges, we also
hold that Deka is not entitled to such deductions.

The next issue for decision is whether Mr. Law's share of
Deka's expenses must be limited to the amount allowed
under section 183.[25] The Commissioner bears the burden of
proving that the partnership was an activity "not engaged
in for profit" within the meaning of section 183, having
raised such issue for the first time by amendment of his
answers. Whether an activity is engaged in for profit turns
on whether the taxpayer has a bona fide objective of

---

[25] Sec. 183(a) provides that "if such activity is not engaged in for profit, no deduction
attributable to such activity shall be allowed under this chapter except as provided in this
section." Sec. 183(b)(1) allows those deductions which would be available without regard to
whether or not such activity is engaged in for profit. Sec. 183(b)(2) provides that deductions
which would be allowable only if such activity is engaged in for profit shall be allowed "but
only to the extent that the gross income derived from such activity for the taxable year
exceeds the deduction allowable by reason of paragraph (1)." Sec. 183(c) defines an "activity
not engaged in for profit" as "any activity other than one with respect to which deductions
are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section
212."

making a profit. *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); *Jasionowski v. Commissioner*, 66 T.C. 312, 321 (1976). In determining whether the partnership engaged in the activity for a profit, "all the facts and circumstances with respect to the activity are to be taken into account." Sec. 1.183-2 (b), Income Tax Regs.; *Jasionowski v. Commissioner, supra*; *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967).

Upon careful consideration of all the relevant facts of record, we conclude that the Commissioner has not carried his burden of proving that Deka's motion-picture-related investment was not engaged in for profit. Most of the relevant facts here were also present in *Tolwinsky*, where we likewise found that the Commissioner had not carried his burden of proof on this issue. Such facts include: (1) The existence at the outset of a reasonable prospect of making a profit (although, unlike *Tolwinsky*, the partnership here did not actually make an economic profit); (2) the care which Mr. Pearl took to select an investment based on the success of a major motion picture, starring prominent actors and assured of a well-financed distribution effort by AIP; and (3) the fact that several of the motion picture partnerships previously promoted by Mr. Pearl and RGF had returned a profit to their investors.

The final issue for decision is whether Mr. Law is entitled to an investment tax credit with respect to "Force 10 From Navarone" in 1978. Deka claimed a qualified investment of $500,000 with respect to the motion picture. In his notice of deficiency, the Commissioner determined that Mr. Law's basis in qualified investment property did not exceed his cash contribution to the partnership, which was $5,117.50 at the end of 1978. By amendment of his answer, the Commissioner determined that Mr. Law was entitled to no investment credit with respect to the motion picture because the film was not "new section 38 property" or because Deka had no "ownership interest" in the film within the meaning of section 48(k)(1). The parties agree for purposes of this case that the qualified U.S. production costs of the film were $500,000. For convenience, we shall

address the first contention of the Commissioner after we have considered the others.

A taxpayer is entitled to an investment credit under section 38 with respect to a motion picture film only if such film is "new section 38 property" (determined without regard to useful life) which is a "qualified film"[26] and only to the extent that the taxpayer has an "ownership interest" in such film. Sec. 48(k)(1)(A). A motion picture is "new" section 38 property until it is placed in service in any medium of exhibition in any geographical area of the world; no investment credit is available to a taxpayer who acquires an ownership interest in the film after such time (except for certain costs subsequently incurred by the taxpayer). Sec. 1.48-8(a)(2), Income Tax Regs. A film is placed in service when it is first exhibited or otherwise utilized before the primary audience for which it was created. Sec. 1.48-8(a)(5), Income Tax Regs. The Commissioner contends that if Deka acquired an ownership interest in "Force 10 From Navarone," it did not acquire such interest until sometime after the film was placed in service in December 1978. He asserts that the Lionel-Deka acquisition agreement and the other documents exchanged between Lionel and Deka were not actually executed until 1979 although they were dated October 19, 1978. While we agree that the documents appear to have been backdated, we do not think it material; the Commissioner himself has argued, and we have found, that Lionel was merely a "strawman" in the chain of title between AIP and Deka. The agreement with AIP was negotiated by Mr. Pearl on behalf of Lionel and Deka, and the substance of such agreement was reduced to writing first in a letter in July 1978, and then in the Wetherly-Lionel acquisition agreement, which was executed before October 19, 1978. See note 9 *supra.* Deka paid Lionel and Lionel paid AIP (through Wetherly) the first installment of the purchase price, $230,000, by October 2, 1978. We therefore conclude that if Deka acquired an ownership interest in the motion picture, it acquired such interest

---

[26] The parties do not dispute that "Force 10 From Navarone" is a "qualified film." A "qualified film" is defined as "any motion picture film or videotape created primarily for use as public entertainment or for educational purposes. Such term does not include any film or tape the market for which is primarily topical or is otherwise essentially transitory in nature." Sec. 48(k)(1)(B).

before the picture was placed in service, and thus, it was "new section 38 property."

A taxpayer may have an "ownership interest" in a motion picture for purposes of the investment credit even if the taxpayer has neither legal title to nor a depreciable interest in the motion picture. Section 48(k)(1)(C) provides that a taxpayer's "ownership interest" in a qualified film "shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." The existence and extent of an ownership interest is determined at the time the film is placed in service. Sec. 1.48-8 (a)(4)(ii), Income Tax Regs.; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 230. In enacting section 48(k), Congress recognized that more than one taxpayer may bear the risk of loss with respect to the production cost of a film, and it authorized the Secretary of the Treasury to establish procedures for determining who is entitled to the credit or to a partial credit in such cases. S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 230.

Section 1.48-8(a)(4) of the regulations defines the "ownership interest" required to claim the entire or a partial credit with respect to a qualified motion picture:

(4) *Ownership interest*—(i) *In general.* To obtain the investment credit with respect to a qualified film, a taxpayer must have an ownership interest in at least a part of the film. That is, the taxpayer must have a depreciable interest in at least a part of the film. However, the amount of credit allowable to a taxpayer with respect to a qualified film is determined only on the basis of that taxpayer's proportionate share of any loss which may be incurred with respect to the production costs of the qualified film. The proportionate share of any loss which may be incurred with respect to the production costs by a taxpayer is the amount that the taxpayer's capital is at risk. * * *

*       *       *       *       *       *       *

(iii) *Certain lenders and guarantors considered to have an ownership interest.* To qualify for the investment credit with respect to a qualified film, the taxpayer must have a depreciable interest in at least a part of the film. Solely for purposes of this paragraph, a taxpayer who, at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof, will be regarded as having a depreciable interest in at least a part of the film if he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film. * * * A commercial lender will not be considered to have an

ownership interest in any film simply by reason of a commercial loan. If a lender or guarantor (other than a producer who owned the film and made or guaranteed a loan to a purchaser) is regarded as having an ownership interest in the film, the lender or guarantor shall be treated as having purchased the interest under paragraph (g)(1) of this section for an amount equal to the principal amount of the loan which it made or guaranteed.

For purposes of section 1.48-8, "a part" of a film "means the exclusive right to display a qualified film in one or more mediums of exhibition in one or more geographical areas over the entire period of substantial exploitation of the film in the medium(s) in the geographical area(s)." Sec. 1.48-8(a)(2), Income Tax Regs. A "medium of exhibition" includes, for example, free television (network telecasts and television syndications) or movie theaters. A "geographical area" is "a geographically defined commercial market recognized by the movie or television industry, but which in no case may be smaller than one country or include a portion of a country" (excepting border areas of the United States and Canada which, under industry practice, are considered part of the U. S. television market). Sec. 1.48-8(a)(2), Income Tax Regs.

The Commissioner contends that Deka did not have an ownership interest in a part of the motion picture because it did not acquire a depreciable interest in the picture. We have already determined that Deka did not acquire a depreciable interest in the motion picture, but such determination does not settle the question of the investment credit. Under section 1.48-8(a)(4)(iii) of the regulations, a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is regarded as having a depreciable interest for purposes of the investment credit if "he can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." Unfortunately, neither party has addressed the question whether Deka possessed an ownership interest by virtue of being a "lender" or "guarantor."

There is no doubt that AIP acquired an ownership interest in a part of the film from Navarone: before the film was placed in service anywhere in the world, AIP paid Navarone

about $2.1 million for all rights to the film (excepting three network broadcasts) in the United States and Canada. Such interest constitutes an ownership interest for purposes of the investment tax credit. See sec. 1.48-8 (a)(2) and (a)(4)(v), examples (1), (3), Income Tax Regs.

Subsequently, but before the film was placed in service, Deka unconditionally promised to pay AIP $560,000 (which amount was paid $230,000 in September 1978, and $330,000 in February 1979) in return for a participation based solely on AIP's gross receipts from the distribution of the film in the United States and Canada. Thus, when the film was placed in service in December 1978, AIP's risk with respect to the production costs of the film had decreased by $560,000, and Deka was at risk as to the production costs for $560,000[27] because the partnership could look for repayment of such amount "solely to the proceeds generated from the exhibition or disposition of at least a part of the film." Sec. 1.48-8(a)(4)(iii), Income Tax Regs. Such fact distinguishes the present case from *Tolwinsky*, where we held that the partnership, Hart Associates, Ltd., did not have an ownership interest in a film for purposes of the investment credit. In *Tolwinsky*, not only did the petitioner expressly deny that the partnership was a lender or guarantor within the meaning of section 1.48-8(a)(4)(iii), Income Tax Regs., but, more importantly, the partnership's payment to the producer of the film, EMI Films, Inc., was not repayable solely from proceeds generated from the subsequent exhibition or disposition of the film. Although the amount of the partnership's participation-like interest was based on the gross receipts reported by the distributor of the film, Universal Pictures, the partnership was entitled to payments from EMI Films, Inc., regardless of whether EMI Films, Inc., actually received any money under its net profits agreement with Universal Pictures.

---

[27] The Commissioner has not contended that Deka did not make a qualified investment in the film of *$500,000* (the amount of the film's qualified U.S. production costs) because Deka actually paid AIP only $230,000 before the film was placed in service. We observe that Deka's risk with respect to the additional $330,000 due in February 1979 was greater than that of a "guarantor." Under the regulations, a guarantor of all or a portion of the funds used to produce or purchase all or a part of a film possesses an ownership interest in the film if he can look for relief from liability solely to the proceeds of the exhibition or disposition of all or a part of the film. Sec. 1.48-8(a)(4)(iii), Income Tax Regs.

We think it unimportant that Deka's payment to AIP was not referred to as a "loan" and that Deka's share of the gross receipts was not limited to repayment of "principal" (the $560,000) plus "interest." The thrust of section 1.48-8(a)(4)(iii) of the regulations is to allow an investment credit to persons with an equity-like interest in the film, even if the interest does not amount to ownership or a depreciable interest, but to disallow it to pure creditors, such as commercial lenders. This approach is supported by the congressional committee reports accompanying the extensive amendments made to section 48(k) by the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520:

*Who is entitled to the credit.*—Under the committee amendment, a taxpayer is to be entitled to the investment credit for a movie film if, and to the extent, that he has an "ownership interest" in the film at the time it is placed in service. For purposes of these rules, a taxpayer will be treated as having an ownership interest to the extent that his capital is at risk.

Thus, if the expenses of producing a movie are incurred by the producer, but are reimbursed by the distributor, *either by means of a nonrecourse loan or otherwise*, the distributor would be entitled to the credit, because the distributor's capital is at risk. Also, if the production costs are paid from the proceeds of a nonrecourse loan supplied by a bank but guaranteed by the distributor, then the distributor would be entitled to the credit because its capital was at risk in connection with the film. A similar result would follow if the producer was liable to the bank on the loan, but the distributor had contracted to pay at least the amount of the loan to the producer in connection with the film.

The determination as to whose capital is at risk in connection with the film (and, therefore, as to who is entitled to the credit) is to be made as of the time the film is first placed in service (*i.e.*, released). Thereafter, the film would be considered used property, which is not to be eligible for the credit under the committee bill.

[S. Rept. 94-938, *supra*, 1976-3 C.B. (Vol. 3) at 229-230; emphasis added.]

See H. Rept. 94-658 (1976), 1976-3 C.B. (Vol. 2) 695, 886.

Our conclusion that a "lender" under section 1.48-8(a)(4)(iii) of the regulations may be a person who has an open-ended financial interest (i.e., a participation) in the proceeds of the film is also supported by example (*1*) of section 1.48-8(a)(4)(v) of the regulations:

*Example (1)*. (a) Partnership P executes a production-distribution agreement with D, a motion picture distribution company, for P to

produce a new feature-length motion picture. D agrees to provide the funds for the production by direct loans to P. The amounts borrowed by P would be repayable only out of net profits from the distribution of the picture. P assumes no liability for the repayment of any amount. In consideration for the sum advanced by D, P assigns to D the sole and exclusive right to rent, lease, exhibit, license and otherwise dispose of, or trade and deal in and with the picture. *Proceeds realized from the sale or distribution of the picture would first be used to reimburse D for amounts advanced. Any amount remaining following the reimbursement to D would be distributed 50 percent to D and 50 percent to P.* For purposes of this example, it is assumed that neither a partnership nor a joint venture is created.

(b) Under paragraph (a)(4)(iii) of this section, D is regarded as having a depreciable interest in the picture for purposes of the credit. P's only interest in the picture is to share in any future profits. Since only D's capital is at risk, D may claim the allowable credit with respect to the entire qualified U. S. production costs of the picture.

[Emphasis added.]

We therefore hold that Deka, which purchased a gross receipts participation in "Force 10 From Navarone," was a "lender" within the meaning of the regulation and, consequently, possessed an "ownership interest" in the film for purposes of the investment credit. We observe that our holding accords with the Commissioner's Revenue Ruling 79-141, 1979-1 C.B. 46, wherein he ruled that a television network that acquired from the producer of a qualified film (1) all rights to display the film for a limited number of telecasts over network television for 90x dollars and (2) a 20-percent interest in net profits generated by any future sales of the film to local non-interconnected stations throughout the United States (i.e., syndication rights) for 2x dollars, is considered to have an ownership interest in a part of the film to the extent of the percentage interest in syndication. He reasoned as follows:

If a taxpayer purchases the right to receive all profits from the exhibition of a qualified film in free television (network telecasts and syndication) in one or more geographical areas, the taxpayer will have acquired a part and will be entitled to claim investment credit determined under section 1.48-8(g)(1) of the regulations. In the present case, $X$ will be considered to have acquired a 20-percent interest in the profits from the exhibition of a qualified film in free television in the United States (network telecasts plus syndication) plus the remaining 80-percent interest in network telecasts. Since $X$ can look to the exhibition of the film in an entire medium in a geographical area for recovery of its investment

with respect to its 20-percent interest in free television, it will be considered to have acquired a part to that extent. * * * [Rev. Rul. 79-141, *supra*, 1979-1 C.B. at 46.]

The third and final question with respect to the investment credit is whether Mr. Law's pro rata share of Deka's qualified investment could not exceed the amount of cash that Mr. Law contributed to the partnership in 1978. On his 1978 return, Mr. Law claimed $7,251 as his pro rata share of Deka's qualified investment of $500,000. Mr. Law owned 11.5 limited partnership "interests" and, pursuant to Deka's limited partnership agreement, was unconditionally and personally obligated to make a capital contribution of $11,500.00, payable $5,117.50 upon subscription, and $6,382.50 by February 25, 1979. Section 1.48-8(a)(4)(iv) of the regulations provides that, if a partnership has an ownership interest in a qualified film, the qualified investment (i.e., qualified U.S. production costs) is apportioned "pro rata among the partners on the basis of their percentage of capital at risk in the partnership at the time the film is placed in service." For purposes of paragraph (a)(4) of section 1.48-8 of the regulations, a taxpayer's capital is considered at risk if it is considered at risk under the principles of section 465 or, regardless of whether the taxpayer is at risk under section 465, if the taxpayer will suffer the economic loss if the film fails to generate sufficient revenue to cover or repay production costs. Here, Mr. Law was clearly at risk in 1978 for the full amount of his required capital contribution, $11,500.00, because he would suffer (and, indeed, did suffer) the economic loss if the film failed to generate sufficient revenue to cover its production costs. We therefore hold that Mr. Law's share of Deka's qualified investment was not limited to the amount of cash he actually contributed in 1978.

Because of our resolution of the above issues, we find it unneccessary to consider alternative contentions raised by the Commissioner in his notices of deficiency and amended answers.

*Decisions will be entered under Rule 155.*