RICHARD J. MADDEN AND PAMELA A. MADDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Madden v. Commissioner
Docket Nos. 19679-85; 5790-86.
United States Tax Court
T.C. Memo 1989-162; 1989 Tax Ct. Memo LEXIS 162; 57 T.C.M. (CCH) 84; T.C.M. (RIA) 89162; April 13, 1989
David A. Schmudde and Martin M. Shenkman, *165 for the petitioners. Frank Agostino, C. Ellen Pilsecker, Matthew Magnone and Patrick E. Whelan, for the respondent. CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for 1980 and 1981 in the amounts of $ 30,126 and $ 55,339, respectively. The issues for decision are: (1) whether the partnership purchased the motion picture "Flash Gordon"; (2) whether the partnership can include the nonrecourse purchase note in basis; (3) whether petitioners' investment is subject to the limitations of section 465; [1] (4) whether the partnership is entitled to use the double declining balance method of depreciation; (5) whether the partnership is entitled to miscellaneous deductions claimed on its 1980 and 1981 returns for expenses relating to advertising; and (6) whether petitioners are liable for additional interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated *166 and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners, Richard J. and Pamela A. Madden, were residents of Upper Saddle River, New Jersey at the time they filed their petition. Petitioners filed their Federal income tax returns for the taxable years 1980 and 1981 with the Brookhaven Service Center. All references to petitioner will be to Richard Madden. Petitioner became a limited partner in Flash Associates, a New York limited partnership, by subscribing for a one-half unit of a limited partnership interest in December 1980. Flash Associates was formed as of May    , 1980, and the general partners of Flash Associates were Ira N. Smith and Stephen R. Greenwald, each of whom were attorneys with limited experience in the motion picture industry at the time of the offering. The partnership units were offered through Plaza Securities, Inc., an entity fully owned by Stephen Greenwald. Plaza Securities, Inc. was to receive a due diligence fee of $ 20,000 plus 10 percent of the offering price of units actually placed by such brokerage dealer. The private placement memorandum (placement memorandum) dated June 4, 1980, stated *167 that the limited partners would be investing an aggregate of $ 5,850,000 in the partnership, the amount of which would be divided into 39 units offered at $ 150,000 per unit, and in exchange the partnership would receive a 99-percent interest in the movie subject to the continuing management fees payable to the general partners. Up to 35 one-half units might be accepted at the discretion of the general partners. Flash Associates was formed "to acquire, own and exploit world-wide rights in a feature-length theatrical motion picture" entitled "Flash Gordon" from its producer, Famous Films Productions, N.V. "Flash Gordon" is an English language feature-length science fiction adventure story involving the adventures of Flash Gordon, a fictional space explorer. The cast includes Sam J. Jones, Melody Anderson, Ornella Muti, Max Von Sydow, and Topol. The picture was directed by Mike Hodges, produced by Dino De Laurentiis and based upon a script by Lorenzo Semple, Jr. The producer is a Curacao, Netherlands Antilles corporation, Famous Films Productions N.V. (Famous Films N.V.), which had advised the partnership that it was the owner of 100 percent of the capital stock of the distributor, *168 Famous Films B.V., a Netherlands corporation. By agreement dated September 9, 1977, Famous Films, N.V. sold all of its rights in and to "Flash Gordon" to Famous Films B.V., and Famous Films B.V. agreed to pay Famous Films N.V. 91 percent of the monies collected from the exploitation of the movie. The capital contributions of the limited partners were indicated as follows: Per Unit
For 39 Units
On the date of executing
$ 2,000
$    78,000
their subscriptions (together
with promissory notes evidencing
the subsequent annual installments)
On September 15, 1980
26,205
1,021,995
On March 15, 1981
51,920
2,024,880
On January 15, 1982
50,000
1,950,000
On January 15, 1983
19,875
775,125
$ 150,000
$ 5,850,000
The proceeds from the sales of the partnership units were to be utilized as follows: Percent of Gross
Proceeds from
Amount
Sale of Units
GROSS PROCEEDS FROM SALE
OF UNITS
[2] $ 5,855,000 100.000%
Less: Offering Expenses,
including selling
commissions, legal
fees and disburse-
ments
660,000 11.272%
NET PROCEEDS FROM SALE
OF UNITS
5,195,000 88.728%
Use of Net Proceeds
General Partners' Fee (1)
$   615,000 10.504%
Net Interest Expense on
Additional Financing (2)
160,000  2.733%
Cash Payment for Picture
1,800,000 30.743%
Marketing Costs
2,200,000 37.575%
Marketing Consultant
Fee (3)
400,000  6.832%
Working Capital
20,000   .341%
*169 (1) Payable only out of the January 15, 1983 capital contribution of the limited, partners or when such contribution is prepaid out of Gross Receipts. (2) To the extent all or a portion of this amount is not utilized for interest costs, it will be retained as additional working capital. (3) Payable to R. A. Inbows, Ltd., an affiliate of Ira N. Smith, one of the General Partners, in consideration for consultant services to be rendered to the Partnership in connection with the release, distribution and marketing of the Picture, particularly in the exercise of the Partnership's rights of consultation under the Distribution Agreement. The following sets forth the compensation to be paid to the general partners and their affiliates in a more specific manner: Entity Receiving
Estimated
Compensation
Type of Compensation
Amount
Operating Stage
General Partners
Management Fees
$ 615,000
Present and continuing 1%
Uncertain
interest profits and losses
Management Fee equal to 5%
Uncertain
of Cash Flow
Liquidation Stage
General Partners
Return of Capital Contri-
5,000
bution after Limited Partners
receive their aggregate Capital
Contributions
1% interest in balance of
Uncertain
proceeds after Limited
Partners receive their aggregate
Capital Contributions
Compensation to Others
R. A. Inbows, Ltd.
Consultant Fee
400,000
an affiliate of
Ira N. Smith, a
General Partner
Smithstone Film
Fee from Producer for
1% of U.S
Productions, Inc.
arranging sale to the
and Canadian
an affiliate of the
Partnership
Theatrical
General Partners
Gross Receipts
between
$ 25,000,000
and
$ 85,000,000
and .5% of
such Gross
Receipts
thereafter
*170 The placement memorandum indicated that an investment in the partnership might not be suitable for investors whose marginal income tax bracket was less than 50 percent. The partnership adopted as a general investor suitability standard the following requirements: (a) He is acquiring the Units for investment and not with a view to resale or distribution; (b) he can bear the economic risk of losing his entire investment; (c) he has a net worth of at least $ 400,000 multiplied by the number of Units to be purchased by him in the Partnership * * * and anticipates he will continue to have in the future, annual taxable income, some portion of which will be subject to a Federal Income Tax rate of at least 50 percent after taking into consideration any losses which may result from this investment; (d) his overall commitment to investments which are not readily marketable is not disproportionate to his net worth, and his investments in the Units will not cause such overall commitment to become excessive; * * * (f) He * * * have [sic] such knowledge and experience in financial and business matters that he is * * * capable of calculating the merits and risks of this investment. *171 Each investor was required to represent in writing the satisfaction of the foregoing requirements. Pursuant to the private placement memorandum, the partnership was expected to acquire "Flash Gordon" from Famous Films N.V. and Famous Films B.V.[3] for a purchase price of $ 36 million, of which $ 1,800,000 would be paid in cash at the closing; $ 14,650,000 would be paid by the delivery of a recourse purchase note bearing interest at the rate of 10 percent per annum and maturing on October 31, 1991; and $ 19,550,000 would be paid by delivery of a nonrecourse purchase note bearing interest at the rate of 10 percent per annum and maturing on October 31, 1991. The recourse purchase note would be recourse as against the partnership except with respect to interest. The purchase notes would be payable prior to maturity only from certain gross proceeds from exploitation of the picture. Each limited partner would be personally liable, with respect to each unit purchased, for a maximum of 2.538 percent of the unpaid principal amount of, but not interest on, the recourse purchase note, equalizing a maximum liability of $ 372,000 per unit. Each partner, also in connection with the acquisition, *172 would grant the producer a purchase money security interest in "Flash Gordon" and additionally certain proceeds from its exploitation. This purchase lien in the proceeds would be subordinated by the producer to a prior lien to be granted to a bank in order to secure a $ 2 million marketing loan which would be incurred by Flash Associates to provide a portion of the marketing cost of "Flash Gordon." For the $ 36 million dollars, the partnership would acquire title to and all rights in the purchased pictures in perpetuity throughout the world and in all media including theatrical, nontheatrical and television rights, subject to the distribution agreement, various subdistribution agreements and the reservation by DDL of certain ancillary rights including remake, sequel, made-for-television motion picture and series rights. In addition, the partnership *173 would acquire various physical materials, including picture negatives, prints and necessary sound track material. The partnership's share of gross receipts or where applicable net profits derived from the exploitation of "Flash Gordon" were determined as follows: Partnership's Percentage of
Partnership's Share of
Gross Receipts
Gross Receipts
70%
0      - $  2,857,000 =
$  2,000,000
10.%
25,000,000 -   45,000,000 =
2,000,000
79%
45,000,000 -   85,000,000 =
31,600,000
79.5%
85,000,000 -   93,900,000 =
7,075,500
5%
over $ 93,900,000 (or 100% of Net Profits,
whichever is greater)
In addition, the partnership was entitled to up to 100% of gross receipts to the extent necessary to pay interest on the marketing loan and the purchase notes. The offering memorandum acknowledged that only a small percentage of motion pictures generate a profit after recoupment of the motion picture. Under this agreement, the limited partners were not to receive distributions equal to their capital contributions unless and until gross receipts equaled $ 85 million or until television proceeds equalled $ 6 million. The placement *174 memorandum also listed a 14-page summary of the risk factors associated with the investment. These included tax risks, operating risks and investment risks. The tax risks included partnership status, risk of audit and disallowance of partnership deductions, status of the partnership as the sole owner of the purchased picture in relationship of DDL with the subdistributors, transactions entered into for profit, limitation on the deductibility of losses to the amount at risk, partnership deductions, depreciation of the purchased pictures, disposition of the purchased pictures and the partnership interest and the availability of investment tax credit and tax law changes among others. Operating risks included competition in the motion picture industry, limited letters of credit and other collateral, the distribution agreement in advertising and advertising services contract, partnership funds and risks of credit of DDL, foreclosure and limited cash flow, as well as the completion of the movie itself. Finally, investment risks included restrictions on transfer, conflicts of interest, no right to manage and liability of limited partners. The placement memorandum also included a multi-page *175 section dealing with the Federal, state and local tax consequences. Additionally, the tax opinion was available to the investors and was completed by the law firm of Carro, Spanbock, Londin, Fass & Geller at the request of the general partners. The opinion stated that no opinion would be rendered with respect to various income tax matters where the law was unclear or which turns on issues of fact such as the allocation of partnership profits and losses, whether the transaction had been entered into for profit and the fair market value of the pictures. Finally, the partners of Flash Associates also requested that the accounting firm of Laventhal and Horwath review a set of projected financial statements of the partnership including projected taxable income loss from 1980 to 1991 and projected cash flow for those same years. This accounting review also projected the after tax-benefits for the investor of the limited partnership interest in the 50, 60 and 70-percent tax brackets for the years 1980 to 1991. The review consisted of comparing the estimates and assumptions used for the placement memoranda, draft of the opinion of tax counsel as to the Federal income tax consequences and *176 verification that the projections have been accurately compiled on the basis of such estimates and assumptions. By agreement dated as of September 15, 1980, Flash Associates purported to purchase the film "Flash Gordon" from Famous Films N.V. and Famous Films B.V. for $ 36 million. The record contains no evidence that the cash payment was made. At the same time the partnership purchased "Flash Gordon," and pursuant to the purchase and sale agreement, the partnership was obligated to enter into a distribution agreement with Famous Films B.V. Additionally, for and in consideration of all loans made pursuant to the purchase and sale agreement, and as collateral security for the payment of such loans, the partnership granted and assigned to Famous Films B.V. (the distributor) all motion picture, television and ancillary rights in and to "Flash Gordon," as well as all literary property rights and all copyrights in the movie or to be obtained in the movie and all rights to renew and extend such copyrights. The assignment also gave Famous Films B.V. the right to sue in both the name of Flash Associates (the partnership) and Famous Films B.V. for any infringement of copyright, past, *177 present or future. Also in connection with the purchase and sale agreement, Flash Associates agreed to pay Famous Films B.V. $ 4,200,000, which was to be used to market and advertise "Flash Gordon." No provision was made for the return to the partnership of any advertising funds not expended by Famous Films B.V. In this regard, the partnership intended to borrow $ 2 million from N.V. Slavenburg's Bank to advance to Famous Films B.V. the nonrefundable amount for "advertising, promotional and marketing costs anticipated to be incurred." It was anticipated, however, that the $ 2 million marketing loan would be repaid upon the partnership's receipt of its share of the $ 2,857,000 of gross receipts from the film. The marketing loan was to be nonrecourse. Flash Associates, also in connection with the advertising of the movie, would pay R. A. Inbows a consulting fee of $ 400,000. R. A. Inbows, Ltd. is an affiliate of Ira N. Smith, one of the general partners. These funds would be in consideration for consultant's services to be rendered to the partnership in connection with the release, distribution and marketing of the picture and particularly with the exercise of the partnership's right *178 of consultation under the distribution agreement. The partnership acquired the film subject to the distribution agreement with Famous Films B.V. and certain subdistribution agreements. The distribution agreement between Flash Associates and Famous Films B.V. was also dated September 15, 1980. Pursuant to the distribution agreement, Famous Films B.V. was to possess: the sole exclusive and irrevocable right throughout the world to advertise, publicize and exploit, and to cause to be advertised, publicized and exploited, the picture in such manner and through such means and media whatsoever as Distributor may determine, including, but not limited to, theatrically and non-theatrically, and by means of television in all forms, whether now known or hereafter to be known, and by means of wire, cartridges, cassettes, and any and all other means of projection, transmission, broadcasting and exhibition together with to the extent acquired by Producer, (a) exclusive publication, performing, synchronization and all other rights in all unpublished music compositions written for or used in connection with the Picture and (b) all right to use and exploit the sound tract of the Picture for *179 phonograph records, tapes, transactions or any other form or medium of any nature whatsoever, for the term limited to a period * * * of ten years from the date hereof provided however, that Distributor shall have the following options * * * to extend such Initial Term and acquire the rights granted to Distributor hereunder for three additional successive terms. [Emphasis added.] The initial term of the distribution agreement was 15 years, and Famous Films B.V. was given options to extend the term for two additional 15-year periods, then into perpetuity. Unless Famous Films B.V. notified Flash Associates in writing that it did not choose to extend the agreement, Famous Films B.V. would be deemed to exercise its option to extend. The price specified of the options to extend was payable only if Flash Associates notified Famous Films B.V. in writing that the amount was due and owing. Otherwise, Famous Films B.V. was to have no obligation to pay. Under the distribution agreement, Famous Films B.V. was to have complete authority to distribute the picture as well as complete control over the leasing, licensing, exploiting and marketing of the picture. Famous Films B.V. was also entitled *180 to edit or modify the picture and its title for any and all purposes whatsoever. The partnership agreed to abide by these modifications whether or not the changes produced the results desired or contemplated. Additionally, Famous Films B.V. had sole discretion to select a subdistributor and had entered into a subdistribution agreement with Universal prior to the execution of the distribution agreement with Flash Associates. Pursuant to the terms of the distribution agreement, the partnership was to receive from the domestic theatrical exploitation of the picture: (1) 0 percent of the first $ 25 million, (2) 10 percent of the next $ 60 million and (3) 5 percent of the excess over $ 85 million. Conversely, Famous Films B.V. was to retain the following percentages of domestic theatrical gross receipts: (1) 100 percent of the first $ 25 million, (2) 90 percent of the next $ 60 million and (3) 95 percent of the excess over $ 85 million. Flash Associates was, however, to receive 10 percent of the first $ 6 million in domestic television proceeds. In addition to the percentages set forth pursuant to the distribution agreement, domestic gross proceeds were to be utilized to make the *181 partnership's interest payments to Slavenberg's Bank of Rotterdam, the Netherlands, the bank that forwarded the $ 2 million necessary to finance the marketing and advertising costs of the picture. The proceeds from the film were also to be used to offset the partnership's liability on the purchase notes. Paragraph 8(d) of the distribution agreement between Flash Associates and Famous provides: (d) Additional United States Gross Television Proceeds participation: Distributor further agrees to pay to Producer an additional amount of United States Gross Television Proceeds equal to the lesser of (i) or (ii) as follows: (i) United States Gross Television Proceeds paid to or earned by the Distributor as of December 31, 1987, less any amounts paid or payable to the Producer pursuant to Section 8(b) as of December 31, 1987; or (ii) The excess, if any (but not less than zero), of (A) over (B) following: (A) Six Million Dollars ($ 6,000,000). (B) Ninety and nine tenths percent (90.9%) of the amounts paid or payable to the Producer pursuant to Sections 8(a) and (b) as of December 31, 1987. The amount, if any, payable to Producer pursuant to this Section 8(d) shall be paid to *182 the Producer on or before January 31, 1988. The entire amount of the recourse purchase note was to be paid from film proceeds. Percentage participations and deferments were excluded from gross receipts when computing net profits. The amounts of excluded percentage participations and deferments were not specified in the distribution agreement. Certain amounts payable to Flash Associates pursuant to the distribution agreement were to be retained by Famous Films B.V., until as late as February 1991 regardless of when the amounts were actually earned. Famous Films B.V. also had the option to convert the license fee payable to Flash Associates from foreign gross proceeds into a fee payable from foreign net proceeds. The definition of net proceeds provided for the subtraction of gross proceeds of more than three times the negative cost of the picture. The subdistribution agreements included a letter agreement between Famous Films B.V. and Universal which secured Universal the U.S. and Canadian distribution and exploitation rights to the movie in exchange for $ 8 million. It also called for Universal to lend Famous Films B.V. $ 7,750,000 to assist with the financing of the movie. *183 The term of this agreement was perpetual. Universal also agreed to lend Famous Films B.V. up to $ 100,000 for publicity expenses. Famous Films B.V. had no obligation to advance funds for advertising. This agreement was entered into on September 17, 1979. As of September 11, 1980, there were 28 contracts in effect for theatrical subdistribution of the picture and a contract with Home Box Office for paid television dated May 31, 1979, when Famous Films B.V. entered into an agreement whereby Home Box Office guaranteed Famous Films B.V. at least $ 2,100,000 for the pay television rights to "Flash Gordon." The total of the minimum guarantees payable by subdistributors with respect to the picture was $ 21,805,678 as of September 11, 1980. The minimum guaranteed amounts payable by third party distributors were sufficient to provide full payment of the principal of the recourse purchase note. Pursuant to paragraph 8(d) of the distribution agreement, moreover, the $ 2,100,000 would be remitted to the partnership irrespective of gross receipts. On or about February 12, 1981, Famous Films B.V. exercised its option to convert the fee payable from foreign gross proceeds into a foreign net *184 proceeds participation. Only four films released during or prior to 1980 earned domestic rentals in excess of $ 93 million. On its 1980 Form 1065, U.S. Partnership Return of Income, Flash Associates claimed the following deductions: Guaranteed payments to partners
$    20,000
Amortization
11,181
Other Deductions
4,618,879
This last entry presumably incorporates the $ 4,200,000 advertising cost and the $ 400,000 consulting fee to R. A. Inbows, although not specifically enumerated on Flash Associates' partnership return. On its 1981 Form 1065, U.S. Partnership Return of Income, Flash Associates claimed the following deductions. Interest
$ 523,497
Amortization
220,841
Consulting Fees
39,205
Banking Charges
73
Processing Fees
57
On his 1980 and 1981 tax returns, petitioner reported his distributive share of the partnership losses in the amount of $ 70,441 and $ 114,955, respectively. OPINION We must first determine whether Flash Associates purchased an ownership interest in the motion picture "Flash Gordon." Respondent contends that the partnership does not possess sufficient attributes of ownership to be considered the owner *185 of the motion picture. Petitioners argue to the contrary. It is well established that the economic substance of a transaction rather than the form in which it is cast is determinative of its consequences. See Golsen v. Commissioner,54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971), and the cases cited therein. Whether the partnership became the owner of "Flash Gordon" for tax purposes as a result of the transactions involved herein is a question of fact to be determined by reference to the written agreements read in light of the attending facts and circumstances. Tolwinsky v. Commissioner,86 T.C. 1009, 1041 (1986); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981). A sale occurs upon the transfer of the benefits and burdens of ownership rather than upon satisfaction of the technical requirement for passage of title under state law. Grodt & McKay Realty, Inc. v. Commissioner, supra.In many cases, the courts have refused to permit the transfer of legal title to shift the incidents of taxation attributable to ownership of the property where the transferor continues *186 to retain significant control over the property transferred. See Helvering v. Clifford,309 U.S. 331 (1940); Helvering v. F. & R. Lazarus Co.,308 U.S. 252 (1939); Durkin v. Commissioner,87 T.C. 1329 (1986); Tolwinsky v. Commissioner, supra at 1009; Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982). "Taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed -- the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 3878 (1930). "It is therefore fundamental that the availability of the depreciation deduction is not predicated on the mere holding of legal title to property but rather upon a capital investment in the property." Gladding Dry Goods v. Commissioner,2 B.T.A. 336 (1925). For tax purposes, a sale of a motion picture occurs when there is a transfer of all substantial rights of value in the motion picture copyright. See Bailey v. Commissioner,90 T.C. 558, 607 (1988); Tolwinsky v. Commissioner, supra at 1042-1043. *187 A sale has not occurred if the transferor retains proprietary rights in the motion picture. A motion picture copyright includes the exclusive rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display to the public still photographs taken from the motion picture. 17 U.S.C. sec. 1 (1976); 17 U.S.C. sec. 106 (1982) (effective January 1, 1978). A review of the record convinces us that Flash Associates never acquired the benefits and burdens of ownership of "Flash Gordon." Pursuant to the purchase and sale agreement, the partnership acquired all of Famous Films N.V.'s and Famous Films B.V.'s right, title and interest with respect to the ownership and exploitation throughout the world of "Flash Gordon" for $ 36 million. Pursuant to that same purchase and sale agreement, however, the partnership was required to simultaneously execute a distribution agreement with Famous Films B.V., which in fact transferred all the basic rights associated with the copyright to Famous Films B. *188 V., leaving Flash Associates with a mere "bare copyright." [4] The offering materials make clear that the possibility of entering into either the purchase and sale or the distribution agreement alone was not contemplated. Thus, Famous Films B.V. reserved remaking sequel rights, theatrical stage rights, all merchandising revenues, book publishing rights, all television and radio rights for its own accounts. Additionally, Famous Films B.V. obtained complete control over the exploitation of the picture. The distribution agreement exclusively stated that it was the parties' intention that Famous Films B.V. should "have the broadest possible latitude in the distribution of the picture." Famous Films B.V. alone was authorized to edit, retitle, advertise, distribute or sell the picture. By means of the distribution agreement, Famous Films N.V. and Famous Films B.V. regained virtually every right that they allegedly transferred to the partnership under the purchase agreement, including the right to sue for copyright infringement in its own name. Such a combination of rights constitutes virtually the entire bundle of rights that is a copyright. Durkin v. Commissioner,87 T.C. at 1369; *189 Tolwinsky v. Commissioner, supra at 1009. There is no evidence, moreover, that the partnership had any control over the exploitation of the motion picture in any way, shape or form. See Durkin v. Commissioner,87 T.C. at 1369-1370. In fact, the agreement made clear that the partnership was not entitled to take any action. The sole contribution to be made by the partnership was financial. [4]
The distribution agreement also provided for these rights to be in effect "perpetually." Under the distribution agreement, there was an initial distribution period of 15 years, and the option to acquire the rights pursuant to the agreement for two additional successive terms for 15 years each, and thereafter, to renew in perpetuity. Famous Films B.V. was "deemed" to have exercised the option if the partnership did not hear to the contrary at least 30 days prior to the expiration of each such term. Famous Films N.V., purported to convey its ownership interest and Famous Films B.V.'s ownership interest in "Flash Gordon" while, in fact, retaining exclusive control over all of the movie *190 effectively for perpetuity by means of the distribution agreement. Finally, while the distribution agreement further provided for the allocation of the domestic gross receipts earned from the exploitation of the film, at best, the partnership was to receive 5 percent of domestic gross theatrical proceeds after break-even and was to have the purchase notes paid from the film proceeds. Additionally, the agreement provided for the distributor to defer substantial portions of amounts due to Flash Associates for substantial periods of time up to approximately 10 years. This, too, indicates that Flash Associates was not the actual owner of the movie. Our conclusion that Famous Films N.V. and Famous Films B.V., rather than Flash Associates, are the true owners of "Flash Gordon" does not require us to view the transaction as one which is wholly lacking in economic substance and which must therefore be disregarded for Federal tax purposes. Rather, we view this transaction as one in which the partnership acquired an intangible contractual right to participate in the distributable gross receipts generated by the film, which is a depreciable interest and recognized for Federal tax purposes. *191 However, because Famous Films N.V. and Famous Films B.V. are the actual owners of the film for Federal tax purposes, Flash Associates cannot claim depreciation on the film. As was stated in Bailey v. Commissioner,90 T.C. at 614, where a movie partnership was also found not to be the true owner of the movie purchased: The only interests acquired by the partnerships were a contingent participation in the distributable gross receipts of Columbia's distribution efforts for each film. The cash investments by the partnerships reduced Columbia's financial risk in the films, but such payments, without more, do not give the partnerships depreciable interests in the film. We must next consider whether the partnership can include the nonrecourse promissory note in basis. The nonrecourse promissory note given by Flash Associates to Famous Films N.V. is payable only out of a portion of the receipts generated by the motion picture. Generally, when debt principal is paid solely out of exploitation proceeds, nonrecourse loans are contingent obligations and are not treated as true debt. Durkin v. Commissioner,87 T.C. at 1376; Estate of Baron v. Commissioner,83 T.C. 542, 550-553 (1984), *192 affd. 798 F.2d 65 (2d Cir. 1986). Once we have determined that the partnership only had an income interest of the exploitation receipts from the motion picture, the debt does not reflect an actual investment in property, cannot be included in the taxpayer's depreciable basis and must be disregarded for tax purposes unless and until paid. The next issue for decision is whether petitioner may be considered at risk within the meaning of section 465 with respect to his share of the debt obligation of the "Flash Gordon" transaction. Section 465, among other things, provides that where an individual invests in motion picture films or television video tapes, any loss for the taxable year should be allowed only to the extent the taxpayer is at risk with respect to the obligations of the activity at the close of the taxable year. Sec. 465(a)(1) and (c)(A). Included in the amount considered at risk are amounts of cash contributed by the taxpayer with respect to the activity, sec. 465(b)(1)(A), and amounts borrowed if the taxpayer is personally liable for repayment of the borrowed amounts or has pledged property other than the property used in the activity as security for the *193 borrowed amounts. Sec. 465(b)(2). Investors will be regarded as personally liable for such obligations pursuant to section 465(b)(2)(A) if they are economically liable to repay the obligations in the event funds from the investment activity cannot do so. In the instant case, no unrelated property was pledged by petitioner as security for the borrowed amount. Petitioner, therefore, will be considered at risk with respect to the recourse note only if he was genuinely personally liable for the amounts due thereunder. Section 465(b)(3) [5] imposes a limitation with respect to amounts investors will be considered at risk. Under that section, investors will not be considered at risk for debt obligations of the investment activity if the amounts borrowed are borrowed from a person who has a continuing interest in the activity other than as a creditor. *194 Section 465(b)(4) [6] imposes a further limitation. That section provides that investors will not be considered at risk for their cash contributions and/or debt obligations if their ultimate liability is protected against loss through "nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements." Section 465(b)(4), particularly the "similar arrangements" language, evidences concern with situations in which taxpayers are effectively immunized from any realistic possibility of suffering an economic loss even though the underlying transaction was not profitable. See Larsen v. Commissioner,89 T.C. 1229 (1987); Follender v. Commissioner,89 T.C. 943 (1987); Melvin v. Commissioner,88 T.C. 63, 75 (1987). Respondent argues that the limited partners of Flash Associates are not at risk pursuant to the limitations of section 465(b)(3) and (b)(4). Respondent contends that the promissory note entered into with Flash Associates cannot be treated as an amount at risk because Famous Films N.V. has an interest in the activity other than as a creditor. Respondent contends further that the financial arrangements of the *195 transaction ensured that the partnership would be returned its cash investment and guaranteed that the limited partners would never have a genuine liability to pay the nonnegotiable cash promissory note. Respondent further highlights that the financial arrangements were not consistent with the standards of the motion picture industry. Thus, the partners' investments were not subjected to the vagaries of the motion picture market in economic and tax terms. Petitioner, not surprisingly, contends that Famous Films N.V. did not have an interest in the movie other than as a creditor, and the amounts contributed were not protected against loss. The payments of these amounts were subjected to the usual business contingencies such as bankruptcy or default on the payments. Additionally, it is pointed out that repayment was not sufficient to completely pay the notes; thus, it only provided some guarantee that a portion of the notes would be paid. We address each in turn. *196 Respondent argues that Flash Associates cannot treat their pro rata shares of the nonnegotiable promissory note as an amount at risk because it was borrowed from a creditor with an interest in the activity other than as a creditor under section 465(b)(3)(A). Respondent's position is set forth in section 1.465-8(a), Prop. Income Tax Regs., 44 Fed. Reg. 32239 (June 5, 1979). That proposed regulation provides, in part, that "amounts borrowed with respect to an activity will not increase the borrower's amount at risk in the activity if the lender has an interest in the activity other than that of a creditor. This rule applies even if the borrower is personally liable for the repayment of the loan or if the loan is secured by property which is not used in the activity." Subsection (b) provides that "the lender shall be considered a person with an interest in the activity other than that of a creditor only if the lender has either a capital interest in the activity or an interest in the net profits of the activity." (Emphasis added.) Sec. 1.465-8(b)(1), Proposed Income Tax Regs.[7] Capital interest is defined as "an interest in the assets of the activity which *197 is distributable to the owner of the capital interest upon the liquidation of the activity." Sec. 1.465-8(b)(2), Prop. Income Tax Regs. An interest in the net profits is defined as "any incidents of ownership in the activity in order to have an interest in the net profits of the activity. For example, an employee or independent contractor any part of whose compensation is determined with reference to the net profits of the activity will be considered to have an interest in the net profits of the activity." Sec. 1.465-8(b)(3), Prop. Income Tax Regs.
Respondent first argues that if we conclude as we have that Flash Associates acquired at best an intangible contractual right to the future profits of "Flash Gordon" for tax purposes, Famous Films N.V. and Famous Films B.V., and not the partnership, are the true owners of the film. Famous Films N.V. and Famous Films B.V., therefore, stand to receive the bulk of the financial gain from the activity and have an interest in the film other than as a creditor. In light of the small downpayment made by the partnership, respondent continues, *198 and the rapidly depreciating nature of the underlying assets, Famous Films N.V. and Famous Films B.V., and not the partnership, would receive the bulk of the proceeds on the liquidation of the activity. By definition therefore, respondent concludes that Famous Films N.V. and Famous Films B.V. each have a capital interest in the activity. See sec. 1.465-8(b)(2), Prop. Income Tax Regs. Respondent next contends that Famous Films N.V. and Famous Films B.V. also have an interest in the net profits of the activity. Respondent points out that the distribution agreement governing the allocation of gross receipts derived from the exploitation of the film purports to provide the partnership with 100 percent of both United States and foreign net profit proceeds after break-even. However, the form used to compute net proceeds virtually guaranteed that at any level of gross receipts there would be no net proceeds and that the partnership interest in the activity is limited to 5 percent of the United States gross proceeds after break-even and none of the film foreign receipts. Thus, Famous Films N.V. and Famous Films B.V. in reality had an interest in the net proceeds of the activity. Petitioners *199 argue that Famous Films N.V. as creditor of the recourse purchase notes did not have an interest other than as a creditor. Petitioners point out that the agreements clearly indicate that Famous Films N.V. had a mere gross profits interest in the outcome in the distribution of the motion picture which is not equivalent to a net profit interest. Additionally, the amounts were not loaned between partners or between joint ventures. Thus, Famous Films N.V., as a mere creditor, would not hold a prohibited interest in the activity. We agree with respondent. We have utilized the capital interest and interest in the net profits tests as guidelines to determine whether any of the creditors in a transaction have prohibited other interests. Levy v. Commissioner,91 T.C. 838, (1988); Larsen v. Commissioner,89 T.C. 1229, 1270 (1987); Bennion v. Commissioner,88 T.C. 684, 696 (1987); Jackson v. Commissioner,86 T.C. 492, 529 (1986), affd. 864 F.2d 1521 (10th Cir. 1989). A capital interest is described in the proposed regulations as an interest in the assets of an activity which would make the assets, or a *200 portion thereof, distributable to the owner of the interest upon liquidation of the activity. Sec. 1.465-8(b)(2), Prop. Income Tax Regs. Because we had determined that Famous Films N.V. and Famous Films B.V. are the actual owners of the movie to the extent of their rights, title and interest in the movie, it clearly had a capital interest in "Flash Gordon." With regard to the net profits test, an interest in the net profits of an activity may exist even though the lender does not possess any incidents of ownership in the activity. In the instant case, Famous Films N.V. and Famous Films B.V. have been deemed the actual owners in "Flash Gordon," see Bennion v. Commissioner, supra at 698, and in a true sense, have an interest in the net profits of the activity. Section 465(b)(3) contemplates fixed and definite rights or interests that realistically may cause creditors to act contrary to how independent creditors would act with respect to their rights under the debt obligations in question: Creditors who hold recourse obligations, but who also have certain other interests in the activity, might disregard their rights thereunder in favor of protecting or enhancing *201 their other interests in the activity. In light of that eventuality and in spite of the otherwise recourse nature of the debt, taxpayers who owe recourse debt obligations to such creditors are not to be regarded as at risk with respect thereto. [Bennion v. Commissioner, supra at 698.] For the reasons stated, we conclude that Famous Films N.V.'s and Famous Films B.V.'s interest in the movie constitutes a continuing interest in this transaction other than as a creditor. Having so found, the provisions of section 465(b)(3) have been violated by this transaction, and petitioners cannot be considered at risk for the amount of the recourse promissory notes. We next consider the additional arguments set forth by respondent pursuant to section 465(b)(4), as pertaining to the cash contributions of the limited partners. Section 465(b)(4) concerns itself with arrangements where taxpayers are not really "at risk" because they are immunized from suffering an economic loss even though the underlying transaction is not profitable. See Porreca v. Commissioner,86 T.C. 821, 838 (1986). The Senate Finance Committee report explains as follows: Also, under *202 these rules, a taxpayer's capital is not "at risk" in the business, even as to the equity capital which he has contributed to the extent he is protected against economic loss of all or part of such capital by reason of an agreement or arrangement for compensation or reimbursement to him of any loss which he may suffer. Under this concept, an investor is not "at risk" if he arranges to receive insurance or other compensation for an economic loss after the loss is sustained, or if he is entitled to reimbursement for part or all of any loss by reason of a binding agreement between himself and another person. [S. Rept. 94-938, at 49 (1976), 1976-3 C.B. (Vol. 3) 49, 87; fn. ref. omitted.] The Senate Finance Committee report continues that: for purposes of this rule * * * the possibility that the party making the guarantee * * * will fail to carry out the agreement (because of factors such as insolvency or other financial difficulty) is not to be material unless and until the time when the taxpayer becomes unconditionally entitled to payment and, at that time, demonstrates that he cannot recover under the agreement. [S. Rept. 94-938 at 50 n.6 (1976), 1976-3 C.B. (Vol. 3) 49, 88 n.6.] *203 Respondent points to several clauses in the various agreements which highlight that Flash Associates was guaranteed the return of its cash investment of $ 1,800,000 in "Flash Gordon," including paragraph 8(d) of the distribution agreement and the Home Box Office agreement. Thus, respondent concludes, on the date Flash Associates "purchased" Flash Gordon" September 15, 1980, there were guaranteed United States television proceeds of $ 2,100,000, which amount, pursuant to paragraph 8(d) of the distribution agreement, would be remitted to the partnership irrespective of gross receipts. Consequently, the limited partners of Flash Associates were protected against the loss of their cash investment. Capek v. Commissioner,86 T.C. 14 (1986); sec. 1.465-6(a), Prop. Income Tax Regs.
We find that petitioners were protected against the economic loss of their investment by means of their agreements with Famous Films N.V. and Famous Films B.V. Several cases have found that taxpayers who are protected from economic loss will not, for purposes of section 465(b)(4), be considered at risk. See Porreca v. Commissioner,86 T.C. at 821; Capek v. Commissioner, supra; *204 Brand v. Commissioner,81 T.C. 821 (1983). As a general rule, a taxpayer is considered at risk for the amount of money he has contributed to the activity. Sec. 465(b)(1). Section 465(b)(4), however, is applicable to cash contributions as well as amounts borrowed. While most of the cases we have reviewed have dealt with amounts borrowed, we are not limited in our holding because it is clearly in accord with the legislative history of section 465(b)(4). In the instant case, petitioner put up funds which were guaranteed to be repaid within a specific time period. The terms of the agreements were clear on this matter. In fact, petitioner concedes this by arguing: that the existence of pre-exisiting agreements to receive payment are sufficient to create this protection against loss. The prior existence of a contract with a television network would provide substantial economic benefits to the partnership. But, this does not guarantee payment of the notes or operate as a protection against loss. The payment of these amounts was subject to the usual business contingencies. The payor could encounter bankruptcy or could default on the payments. In addition, the prepayment *205 was insufficient to completely pay the notes. Thus it only provided some guarantee that a portion of the notes would be paid. The contingencies listed by petitioner are not to be considered "risks" if and until they occur. Capek v. Commissioner,86 T.C. at 52-53; sec. 1.465-6(c), Prop. Income Tax Regs. Moreover, the partial guarantee was adequate to cover the cash portion of the investment, our focus. The cash contributions are not at risk pursuant to section 465(b)(4). We next determine whether Flash Associates is entitled to use the declining balance method of depreciation. On its returns, the partnership used the double declining balance method to compute its depreciation deduction. We have determined that Flash Associates purchased a contractual right in "Flash Gordon" and not the motion picture itself. The contractual right to participate in a motion picture's gross receipts is an intangible asset. See Law v. Commissioner,86 T.C. 1065, 1098, 1109 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1046, 1053 (1986). The declining balance method may not be used to depreciate intangible property. Sec. 167(c). Generally, *206 a change in the taxpayer's depreciation method constitutes a change in the taxpayer's method of accounting, which normally requires the Commissioner's consent. Sec. 446(e); sec. 1.167(e)-1, Income Tax Regs. However, such consent is not required if the taxpayer's chosen method of depreciation is found to be unacceptable, and then he seeks to adopt the straight-line method. Sec. 167(e)(1); sec. 1.167(b)-l and (e)-1, Income Tax Regs. Flash Associates' depreciation method is unacceptable because it did not purchase a motion picture (a tangible asset), but an intangible contractual right to share in future profits. Respondent argues that the partnership must use the straight-line method. Petitioner offers no alternative. Neither party suggests that the partnership employ the income forecast method. [8] Thus, the straight-line method must be used to calculate the partnership's depreciation deduction. See Durkin v. Commissioner,87 T.C. 1329 (1986); Law v. Commissioner, supra.The straight-line method is applicable to intangible properties. See sec. 167. *207 We must next consider whether the partnership is entitled to deductions for expenses paid for movie and advertising services in connection with the distribution of "Flash Gordon" as reflected on its 1980 and 1981 return. In his notice of deficiency, respondent disallowed the amounts in question. Petitioners bear the burden of proof as respondent's determination is presumptively correct. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Petitioners offered no testimony at trial to explain or substantiate the amounts deducted on the 1980 and 1981 Form 1065 returns. Furthermore, the documents do not reflect that any of the amounts were actually paid, or if paid, that they were paid during 1980 or 1981. Petitioners failed to offer any proof as to the deductibility of the enumerated expenses and, accordingly, are not entitled to deduct any portion of the claimed expenses. As respondent points out, the partnership purportedly paid $ 4,200,000 to Famous Films B.V. to market "Flash Gordon," but Famous Films B.V. was not the distributor of "Flash Gordon" nor did it have any obligation to expend, market, advertise or distribute "Flash Gordon." Rather, Famous Films *208 B.V. had entered into subdistribution agreements with Universal and Twentieth Century-Fox for domestic (including Canada) and foreign theatrical and television distribution. This Court has reviewed similar advertising service agreements. [9] In Isenberg, for example, we concluded that the partnership was financing the advertising and not itself incurring advertising expenses. The same situation would appear to be present in the instant case. The record is devoid of any evidence that Flash Associates actually paid this amount or that the funds were used for such purpose. The partnership did not even attempt to substantiate that it was involved in the distribution strategy of the film. The sole purpose of the advertising services arrangement was to provide the partnership with an immediate up-front deduction, and the deduction must therefore be disallowed. [10]
Finally, we consider the $ 400,000 consulting service fee to R. A. Inbows, an affiliate of the general partner, Ira Smith. Pursuant to this agreement, R. A. Inbows was *209 to exercise the partnership's "non-binding consultation" rights it retained pursuant to the distribution agreement to "protect its ownership interest" as well as render consulting services to the partnership in connection with the release of the film. The expense is explained in the private placement memorandum as follows: The partnership will retain R. A. Inbows, Ltd., an Affiliate of Mr. Smith, to consult with the Partnership concerning the marketing of the Picture and will pay R. A. Inbows, Ltd. a fee of $ 400,000 for such services. The officers and directors of R. A. Inbows, Ltd. have had limited experience in the marketing of motion pictures. The subdistribution agreement between Famous Films B.V. and Universal indicated that the advertising and marketing plan for "Flash Gordon" was in place prior to the partnership's purchase of the picture. Although the agreement gave the right to consult in connection with the distribution of the film, there is virtually no evidence that this transpired. Consequently, the amount paid to the affiliate of the general partner for marketing is not allowable. Finally, we must determine whether petitioner should be subject to additional interest *210 under section 6621(c) of the Code. Section 6621(c) provides for an increase in the rate of interest to 120 percent of the otherwise applicable annual rate with respect to a substantial underpayment (an underpayment of at least $ 1,000) attributable to one or more tax-motivated transactions. Sec. 6621(c)(1). Additional interest accrues after December 31, 1984, regardless of the filing date of the returns. DeMartino v. Commissioner,88 T.C. 583, 589 (1987). Section 6621(c)(-3)(A)(ii) defines the term "tax-motivated transaction" to include any loss disallowed by section 465(a). If the loss claimed is disallowed by reason of section 465(a), the resulting deficiency is by definition the consequence of a tax-motivated transaction. For this reason, the underpayments resulting from such disallowed deductions are attributable to tax-motivated transactions. Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Includes $ 5,000 contributed by the general partners.↩
3. Pursuant to the Purchase and Sale Agreement dated September 15, 1980, Famous Films N.V. acted for itself to the extent of its right, title and interest in the movie, and as agent for Famous Films B.V. to the extent of its right, title and interest. The seller, therefore, refers to both Famous Films N.V. and Famous Films B.V.↩
4. See Isenberg v. Commissioner,T.C. Memo. 1987-269↩.
5. Section 465(b)(3) provides as follows: (b) Amounts Considered at Risk. -- * * * (3) Certain borrowed amounts excluded. -- For purposes of paragraph (1)(B), amounts borrowed shall not be considered to be at risk with respect to an activity if such amounts are borrowed from any person who -- (A) has an interest (other than an interest as a creditor) in such activity, or (B) has a relationship to the taxpayer specified within any one of the paragraphs of section 267(b).↩
6. Section 465(b)(4) provides as follows: (b) AMOUNTS CONSIDERED AT RISK. -- * * * (4) EXCEPTION. -- Notwithstanding any other provision of this section, a taxpayer shall not be considered at risk with respect to amounts protected against loss through nonrecourse financing, guarantees, stop loss agreements, or other similar arrangements.↩
7. These proposed regulations have not yet been finalized and, therefore, are not authority.↩
8. Law v. Commissioner,86 T.C. 1065, 1104 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1053-1054 (1986). In those cases, respondent conceded that the taxpayers be permitted to use the straight-line method. See also Bailey v. Commissioner,90 T.C. 558, 619-621↩ (1988), for a description of how the income forecast method is calculated in the depreciation of motion pictures.
9. See Isenberg v. Commissioner,T.C. Memo. 1987-269↩. 10. See Schwartz v. Commissioner,T.C. Memo. 1987-381↩.